# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Jan 31 2012, 9:34 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| NATHAN ANDERSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1105-CR-243 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-0903-MR-35798

**January 31, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Nathan Anderson entered Jane Pepper's apartment through a bathroom window. Anderson stabbed Pepper numerous times, killing her. He also had sexual intercourse with Pepper either just before or just after the murder. A jury found Anderson guilty of murder, class B felony burglary, and class D felony abuse of a corpse. The trial court sentenced Anderson to eighty-eight years in prison. On appeal, Anderson contends that the trial court abused its discretion when it admitted into evidence a statement he made to police in which he confessed to his crimes because officers continued to interrogate him despite a clear request for an attorney. Anderson also contends that the trial court abused its discretion in admitting DNA evidence linking him to the murder scene because that evidence was obtained with a buccal swab, which he alleges was taken in violation of the applicable Indiana statute and in violation of his federal and state constitutional rights.

We conclude that the admission of Anderson's police statement was error, but was harmless beyond a reasonable doubt with regard to the murder conviction alone. The erroneous admission of Anderson's police statement unquestionably influenced the jury verdicts as to his convictions for burglary and abuse of a corpse; therefore, we reverse those convictions. Additionally, we conclude that the DNA evidence was obtained by "mistake," which constitutes a valid exception to the applicable statute and our federal and state exclusionary rules. Regarding Anderson's additional challenge to his sentence, we find no abuse of discretion on the part of the trial court and conclude that Anderson's murder sentence is appropriate in light of the nature of the offense and Anderson's character.

2

Accordingly, although we vacate Anderson's burglary and abuse of a corpse sentences, we affirm Anderson's sixty-five year sentence for murder and decline the invitation for sentence revision.

**Facts and Procedural History**

The relevant admissible evidence indicates that on Thursday, October 25, 2007, forty-four-year-old Jane Pepper spent the evening alone in her Indianapolis apartment. Pepper's apartment was on the ground level of the apartment building, and Pepper often left her bathroom window open to allow her two cats to roam freely. Pepper spoke with her boyfriend on the phone around 11:00 p.m. and discussed her plan to attend a Purdue University football game with friends that Saturday. Pepper and her boyfriend, Charles Brnardic, had been in a serious and exclusive relationship since February of 2007. Shortly after 11:00 p.m., a neighbor saw Pepper lean out her apartment door to coax one of her cats inside. Pepper told the neighbor not to worry about the other cat because he could just use the open bathroom window to come in later.

Pepper did not report to work the next day or show up for the Purdue game that Saturday. Similarly, Pepper did not report to work on Sunday, and calls from Brnardic and friends went unanswered. On Monday, October 29, after friends and coworkers were unable to contact Pepper for several days, Brnardic went to the apartment complex and enlisted the aid of a leasing agent to gain access to Pepper's apartment. Upon entry, they discovered Pepper's blood-soaked corpse lying on the bedroom floor. Police were immediately summoned. Pepper's blood-soaked corpse was found naked from the waist down. Her

3

bloody pajama bottoms, that had apparently been cut off her body, were found lying on the bed. A small pink towel, obviously placed on her after her death, was draped across her lower back. Blood was spattered on the bed, walls, and floor, and the bathroom window was open. Officers found four bloody kitchen knives, one with a broken blade, near Pepper's body.

An autopsy revealed that Pepper sustained numerous stab wounds to her face, chest, hands, and both sides of her neck. She also sustained a stab wound to her back, which punctured her left lung. Although any number of the wounds could have been fatal, the stab wound to the right side of her neck severed her jugular vein, lacerated her thyroid gland, and cut completely across her esophagus. Examiners surmised that death occurred in minutes rather than hours due to the nature of the injuries.

Vaginal swabs of Pepper's body along with the pink towel found on her body revealed the presence of sperm cells and seminal material. Several of the spermatozoa remained intact, indicating sexual intercourse within the timeframe of the murder. In November of 2007, the DNA profile developed from this material was uploaded in CODIS, a computer software program that operates national databases of DNA profiles from convicted offenders and unsolved crime scene evidence. No match resulted.

Following an unrelated incident, on August 25, 2008, Anderson was charged in Marion County with class B felony criminal confinement, class C felony intimidation, class D felony criminal confinement, class D felony pointing a firearm, and class A misdemeanor domestic battery. Anderson pled guilty to class D felony criminal confinement and class A

4

misdemeanor domestic battery. Pursuant to the open plea agreement, alternative misdemeanor sentencing was available to the trial court for the class D felony.[1] Accordingly, the trial court entered judgment of conviction against Anderson on the confinement charge and the domestic battery charge, both as class A misdemeanors. However, the abstract of judgment and the order of probation issued by the trial court indicated that Anderson had been convicted of class D felony criminal confinement.

Marion County Probation Officer Joe Smith performed an intake interview with Anderson on December 22, 2008. After reviewing the order of probation and the abstract of judgment, Smith determined that Anderson had been convicted of a felony and advised Anderson that he was required to submit to a buccal swab for DNA. Anderson proceeded to an administrative office, wherein a cotton swab was rubbed against the inside of his cheek. Soon thereafter, Anderson implied to his girlfriend that he had killed someone and asked her how long she thought DNA lasted.

In January 2009, Anderson moved to Longview, Texas and his probation was transferred to the "NET caseload" to accommodate the move. State's Ex. 169 at 7. On February 3, 2009, Anderson's DNA profile was loaded into CODIS, and a match with the DNA found at the scene of Pepper's murder was detected on February 22, 2009. The Indiana State Police laboratory performed independent testing which confirmed the DNA match. On March 23, 2009, the Indianapolis Metropolitan Police Department ("IMPD") was notified of Anderson's identity. Because Anderson had also failed to appear for a probation violation,

---

[1] *See* Ind. Code § 35-50-2-7.

officers obtained an arrest warrant as well as a search warrant to obtain a second buccal swab from Anderson. IMPD Detectives Robert Flack and Marcus Kennedy flew to Texas to meet with Anderson on March 25, 2009. The detectives met with Anderson in an interview room at the Longview Police Department.

Before questioning began, Anderson signed an advisement of rights form provided by the Longview Police Department. Detectives questioned Anderson from approximately 5:00 p.m. on March 25, 2009, until 3:00 a.m. on March 26, 2009. During questioning, Anderson was permitted several breaks to use the restroom, smoke, make phone calls, and eat food. Anderson was also permitted to meet privately with his father, an ordained minister and resident of Longview, approximately two or three times during the questioning. During questioning, officers told Anderson that they had his DNA from Pepper's murder scene and that they knew he had sex with her around the time of her murder. Anderson told police that he knew Pepper and that he and Pepper had an ongoing sexual relationship. As police continued to question and challenge the credibility of Anderson's explanation for his DNA being at the murder scene, the following colloquy occurred:

Detective Flack: You said you came inside of her before.

Mr. Anderson: I don't know. I really would like to talk to an attorney or something because I don't know where this is going. I don't want y'all to feel that I'm lying to you in any kind of way. I'm confused and there's a lot of stuff going on.

Detective Flack: All of a sudden you're confused?

Mr. Anderson: Yeah, because you say she's a homicide victim.

Detective Flack: Yeah.

6

Tr. at 1157; State's Ex. 169 at 50-51. Detectives did not cease the interview but continued questioning Anderson until he eventually confessed that he had not known Pepper prior to the night in question, that he entered Pepper's apartment through the open bathroom window with the intent of stealing money therein, that Pepper was sleeping and awoke when he entered her apartment, that he murdered Pepper by stabbing her numerous times, and that he had sexual intercourse with her dead body. Detectives obtained a second buccal swab of Anderson and, on March 29, 2009, a second confirmatory analysis established Anderson's DNA as the DNA from the scene of Pepper's murder.

On March 31, 2009, the State charged Anderson with murder, class B felony burglary, and class D felony abuse of a corpse. Although Anderson, a diagnosed schizophrenic, was initially found incompetent to stand trial, he was later declared competent in August 2010. Prior to trial, Anderson filed motions to suppress his statement to police as well as the DNA evidence. Following hearings, the trial court issued extensive findings of fact and conclusions of law denying both motions to suppress. Thereafter, a five-day jury trial ensued. The jury found Anderson guilty as charged. The trial court sentenced Anderson to consecutive sentences of sixty-five years for murder, twenty years for burglary, and three years for abuse of a corpse, resulting in an aggregate sentence of eighty-eight years. This appeal followed.

## Discussion and Decision

### I. Right to Counsel

Anderson first asserts that the trial court abused its discretion when it admitted into

7

evidence his statement made during questioning by police in which he confessed to murder, burglary, and abuse of a corpse. Specifically, Anderson asserts that he unequivocally invoked his right to counsel during police questioning but that his request was ignored and the interrogation continued in the absence of counsel. Accordingly, he argues that the admission of his statement violated his right to counsel. We agree with Anderson.

As Anderson's claim involves the trial court's decision to admit evidence at trial, our standard of review as to the admissibility of the evidence is for an abuse of discretion. *Roush v. State*, 875 N.E.2d 801, 808 (Ind. Ct. App. 2007). An abuse of discretion occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Our supreme court recently considered the invocation of the right to counsel pursuant to federal jurisprudence. Indeed, the Court explained:

> As established in *Miranda v. Arizona,* prior to any questioning of a person taken into custody, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706–07 (1966). If the accused requests counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S. Ct. 1880, 1883, 68 L. Ed. 2d 378, 384 (1981) (quoting *Miranda,* 384 U.S. at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 723). An accused's request for counsel, however, must be unambiguous and unequivocal. *Berghuis v. Thompkins,* 560 U.S.__, __, 130 S. Ct. 2250, 2259, 176 L. Ed. 2d 1098, 1110 (2010). The cessation of police questioning is not required "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis v. United States,* 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362, 371 (1994).

*Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010). Indeed, "[i]nvocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an

expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459 (quotation marks and citation omitted). The request must be made with sufficient clarity such that a "reasonable police officer under the circumstances would understand the statement as a request for an attorney." [2] *Id.*

In this case, Anderson's invocation of his right to counsel was unequivocal. Once Anderson stated, "I really would like to talk to an attorney or something," State's Ex. 169 at 50-51, his right to counsel should have been "scrupulously honored." *Miranda*, 384 U.S. at 479. We disagree with the trial court's determination that Anderson's request was expressed with uncertainty. The addition of the words "or something" did not qualify or equivocate Anderson's clear statement that he "really would like to talk to an attorney." State's Ex. 169 at 50-51. The addition of "or something" would appear to be a habit of speech as opposed to a statement of equivocation. Moreover, Anderson's subsequent statement that he was "confused" was an indication that he was getting confused about the version of events that he was giving police, not an indication that he was confused about wanting an attorney. *Id.* Anderson's request was made with sufficient clarity such that a reasonable police officer under the circumstances would understand that Anderson was unambiguously asserting his right to counsel.

---

[2] Here, at the outset of the interrogation Anderson signed an advisement of rights form acknowledging that he had been advised of his *Miranda* rights. However, such form did not include a written waiver of those rights. We note that an accused may waive the right to counsel, if done voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. However, even if an accused elects to waive his rights orally or in writing, the waiver may be rescinded at any time, and "[i]f the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis*, 560 U.S. at ___, 130 S. Ct. at 2263-64.

The State directs us to cases in which language somewhat similar to that used by Anderson was determined to be equivocal and ambiguous. For example, in *Davis*, the United States Supreme Court determined that the defendant's statement "maybe I should talk to a lawyer" was not an unequivocal request for counsel. *Davis*, 512 U.S. at 462. In *Taylor v. State*, 689 N.E.2d 699 (Ind. 1997), the defendant stated, "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know." *Id*. at 703. Our supreme court determined that the defendant's statement was "an expression of doubt, not a request" and was merely the suspect choosing to "think out loud about whether to exercise his constitutional right." *Id*. at 703-05. In *Powell v. State*, 898 N.E.2d 328 (Ind. Ct. App. 2008), *trans. denied*, this Court considered the defendant's statement "Could I see about getting a lawyer or something man?" *Id*. at 337. We found the wording of that statement, which was posed as a question to officers, to be ambiguous and not sufficiently clear as to constitute a request for an attorney.[3] We emphasized in *Powell* that officers immediately followed up

---

[3] *See also Collins v. State*, 873 N.E.2d 149, 156 (Ind. Ct. App. 2007) (holding that defendant's question "Do I need an attorney" and later observation "I probably need an attorney" were not unequivocal requests for an attorney), *trans. denied*.

and asked the defendant if he, in fact, wanted an attorney. When directly asked, the defendant did not say yes or clarify that he wanted counsel.[4]

Here, Anderson neither posed a question regarding needing an attorney as in *Powell,* nor expressed doubt as to whether he needed an attorney as in *Davis* and *Taylor.* To the contrary, he clearly stated, "I really want to talk to an attorney or something." The State argues, or at the very least implies, that in order to make an unequivocal invocation of the right to counsel a defendant must "start and end" with "I want to talk to an attorney" and say nothing else. Appellee's Br. at 18. That would be clear and nice wouldn't it? However, the State ignores the reality of an interrogation room, the naïveté of a defendant, and what often may be the diminished mental capacity of a defendant. Anderson was a twenty-two-year-old diagnosed schizophrenic, not a constitutional scholar. We are getting to the point in the interpretation of our constitutional law where the exceptions are swallowing the rules. We should not go further down the slippery slope the State urges and further eviscerate *Miranda* and an accused's right to counsel. Anderson's request for counsel in this case was unambiguous. The language used by Anderson was a clear invocation of the right to counsel,

---

[4] We note that the United States Supreme Court has held that police have no duty to cease questioning when an equivocal request for counsel is made, nor are they required to ask clarifying questions to determine whether the suspect actually wants a lawyer. *Davis*, 512 U.S. at 461. However, the *Davis* court acknowledged that it will often be good police practice to clarify an ambiguous or equivocal statement in order to protect the rights of the suspect and minimize the chance of a confession being suppressed due to subsequent judicial second-guessing. *Id*. at 452. The police officers in *Powell* followed this protocol. While the State argues that officers here similarly followed up with Anderson when later asking him "So what do you want to do," State's Ex. 169 at 51, such minimal attempt at clarification is of no moment. First, as stated, Anderson's request for an attorney was unequivocal, not requiring clarification, but instead requiring immediate cessation of further questioning. Moreover, the purported clarification fails even to acknowledge or reference Anderson's request for an attorney.

and the officers' continued interrogation violated his constitutional rights. Therefore, the trial court abused its discretion when it admitted Anderson's statement into evidence at trial.[5]

Nevertheless, statements obtained in violation of the federal constitution and erroneously admitted are subject to harmless error analysis. *Storey v. State*, 830 N.E.2d 1011, 1021 (Ind. Ct. App. 2005). We review a federal constitutional error de novo, and the error must be harmless beyond a reasonable doubt. *Id.* The State has the burden to demonstrate that the improper admission of a defendant's statement did not contribute to the conviction. *Alford v. State*, 699 N.E.2d 247, 251 (Ind. 1998) (citation and quotation marks omitted). "'To say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). In other words, if the State has presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless. *Storey*, 830 N.E.2d at 1021.

Regarding Anderson's murder conviction, notwithstanding the admission of his police statement, the State presented other overwhelming evidence of Anderson's guilt sufficient to render the erroneous admission of his statement harmless. First, the DNA evidence, the admissibility of which we address in the next section, placed Anderson at the scene of

---

[5] Because we conclude that Anderson's right to counsel pursuant to the federal constitution was violated, we need not address whether his rights were similarly violated pursuant to Article 1, Section 13 of the Indiana Constitution. It should be noted, however, that our supreme court has concluded that our state constitution affords essentially the same protection regarding custodial interrogations as its federal counterpart. *See Taylor*, 689 N.E.2d at 703-04.

Pepper's brutal murder. Anderson's intact sperm cells were found on vaginal swabs of Pepper's body, indicating that Anderson had sexual intercourse with Pepper within the time-frame that she was also murdered. Because DNA evidence placed Anderson's sperm inside Pepper's body, the key defense theory was that Anderson and Pepper had an ongoing relationship and that Anderson merely had consensual sexual intercourse with Pepper just prior to her murder. However, testimony of Pepper's friends and family indicated that the then-twenty-one-year-old Anderson was an absolute stranger to forty-four-year-old Pepper. There was no evidence to indicate that Pepper and Anderson had ever met or ever had the opportunity to meet prior to the murder. By all accounts, Pepper was in a serious and exclusive relationship with her boyfriend, Brnardic.

Pepper's body was found naked from the waist down, and her bloody pajama pants, which had apparently been cut off her body, were found nearby. This evidence supports a reasonable inference by the jury that the same individual who had murdered Pepper also had sexual intercourse with her either just before or just after the murder. The only seminal fluid or DNA recovered was that of Anderson. Anderson's seminal fluid and DNA were also found on a small pink towel that was draped over Pepper's body after she was murdered. Again, it was reasonable for the jury to conclude that Anderson's sexual intercourse with Pepper occurred contemporaneously with her murder.

Additionally, the jury heard the testimony of Laura Cox, Anderson's girlfriend at the time of the murder. Cox testified that shortly after Anderson was swabbed for DNA by the probation department following his commission of unrelated crimes, Anderson asked Cox

13

about how long she thought DNA evidence lasted at a crime scene. Cox, who was earning a bachelor's degree in criminal justice science, found this questioning strange. Anderson then informed Cox that he had "done something that would earn him a teardrop" tattoo for his eye. Tr. at 605. Cox explained to the jury that individuals get teardrop tattoos to signify that they have murdered someone. Cox went on to testify that when she further questioned Anderson, he told her that he had thrown a knife or knives over a bridge and assured her that she did not need to worry about anything. When Cox later learned that DNA linked Anderson to Pepper's murder, she decided to come forward and tell police what Anderson had told her.

The State presented overwhelming evidence from which a jury could reasonably conclude beyond a reasonable doubt that Anderson murdered Pepper. The cumulative admissible evidence satisfies the State's burden to demonstrate that the evidence was sufficient without the improper admission of Anderson's police statement. Thus, Anderson's police statement was unnecessary for his murder conviction, and its admission by the trial court was harmless beyond a reasonable doubt.

We cannot say the same regarding Anderson's convictions for burglary and abuse of a corpse. The key elements of those offenses were provided to the jury only through Anderson's statement. Without his police statement, the jury would not have been able to conclude beyond a reasonable doubt that Anderson broke into Pepper's apartment with the intent to commit theft therein or that Anderson had sexual intercourse with Pepper's body post mortem. Consequently, we must reverse Anderson's convictions for burglary and abuse of a corpse. The State, however, may retry Anderson for these offenses. A reversal for

14

insufficient evidence bars retrial under the Double Jeopardy Clause, but analysis for such sufficiency includes consideration of the erroneously admitted evidence. *Carr*, 934 N.E.2d at 1109. Although we must reverse here due to the trial court's error in the admission of evidence, "'clearly *with* that evidence, there was enough to support'" the jury's verdicts and resulting convictions. *Id.* (quoting *Lockart v. Nelson*, 488 U.S. 333, 40 (1988)). Accordingly, Anderson may be subject to retrial on these offenses if the State so chooses.

## II. DNA Evidence

Next, we consider Anderson's challenge to the admission of the DNA evidence at trial. Specifically, Anderson argues that the DNA evidence was obtained in violation of Indiana Code Section 10-13-6-10, which requires only convicted felons to submit DNA samples. Anderson maintains that the collection of his DNA was not a "mistake" within the meaning of subsection (c) of that statute. Additionally, Anderson contends that the buccal swab of his mouth violated his constitutional rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, and thus the evidence should have been excluded. We will address each argument in turn.

We begin by reiterating that our standard of review as to the admissibility of evidence is for an abuse of discretion. *Roush*, 875 N.E.2d at 808. An abuse of discretion occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

### A. Indiana Code Section 10-13-6-10 and the Mistake Exception

15

Indiana Code Section 10-13-6-10 provides, in relevant part, that a person convicted of a felony, conspiracy to commit a felony, or attempt to commit a felony "shall provide a DNA sample" to the "agency that supervises the person, or the agency's designee, if the person is on conditional release in accordance with Indiana Code Section 35-38-1-27." Subsection (c) of the statute further states that "[t]he detention, arrest, or conviction of a person based on a data base match or data base information is not invalidated if a court determines that the DNA sample was obtained or placed in the Indiana DNA data base by mistake." Ind. Code § 10-13-6-10(c).

We agree with the trial court that what happened in this case fits squarely within the "mistake" exception provided by Indiana Code Section 10-13-6-10. Ten months after Pepper was murdered, Anderson was charged with various crimes, including class D felony criminal confinement, in an unrelated case. Pursuant to a plea agreement, Anderson was sentenced according to the alternate misdemeanor sentencing statute, Indiana Code Section 35-50-2-7(b).[6] Therefore, the resulting judgment of conviction entered by the trial court was for a class A misdemeanor. However, when Anderson appeared for his probation intake interview, probation officer Smith reviewed the order of probation received from the trial court. That document clearly indicated that Anderson had been convicted of criminal confinement as a class D felony with no mention of alternate misdemeanor sentencing. The record also reveals that the abstract of judgment received from the trial court stated that Anderson was convicted

---

[6] That section provides that "if a person has committed a Class D felony, the court may enter judgment of conviction of a Class A misdemeanor and sentence accordingly."

of criminal confinement as a class D felony with no mention of alternate misdemeanor sentencing. Unbeknownst to Smith, the information provided in those documents by the trial court was inaccurate. Smith relied on the information when he advised Anderson that, because he was convicted of a felony, he was required to submit a DNA sample. Anderson did not correct Smith or state that he had been convicted of only a misdemeanor. Instead, Anderson proceeded to another office and submitted to a buccal swab for DNA.

The record clearly establishes that Smith relied upon two court orders when advising Anderson that he was required to submit a DNA sample. As noted by the State, as a probation officer, Smith "serve[s] at the pleasure of the appointing court and [is] directly responsible to and subject to the orders of the court." Ind. Code § 11-13-1-1(c). We disagree with Anderson's contention that the buccal swab was taken with intentional or reckless disregard of his constitutional rights. Instead, the DNA evidence was obtained and placed in the DNA database by mistake. Having determined that the DNA evidence was obtained by mistake, we must now turn to the admissibility of the evidence pursuant to constitutional principles.

### B. The Mistake Exception and the Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. We begin by noting that our supreme court recently declined to affirmatively declare that a cheek swab for DNA constitutes a "search" for Fourth Amendment purposes. *Garcia-Torres v. State*, 949 N.E.2d 1229 (Ind. 2010). This Court,

however, has held that while the taking of a biological sample, such as a DNA sample, indeed constitutes a "search" for purposes of the Fourth Amendment, the statutory requirement that a defendant convicted of a felony submit a DNA sample for the DNA database comes within the special needs exception against suspicionless searches. *Balding v. State*, 812 N.E.2d 169, 172 (Ind. Ct. App. 2004).[7] In *Balding*, we specifically considered a buccal swab and determined that (1) a convicted offender had a reduced expectation of privacy, (2) the character of the intrusion was minimal because the procedure was noninvasive and pain free, and (3) the State has a substantial interest in creating a database of DNA samples from convicted offenders. Accordingly, we concluded that the compulsory collection of DNA samples from convicted offenders to be included in Indiana's DNA database does not violate the Fourth Amendment.[8] *Id*. at 173-74; see *also Keeney v. State*, 873 N.E.2d 187, 189 (Ind. Ct. App. 2007).

Anderson maintains that, unlike a convicted felon, as a convicted misdemeanant, he did not possess a reduced expectation of privacy. Thus, he argues that admission of the DNA evidence pursuant to the "mistake" exception of Indiana Code Section 10-13-6-10(c) violated his Fourth Amendment rights. First, we do not agree with Anderson that a defendant who commits and pleads guilty to a crime that is a felony but is merely sentenced pursuant to the

---

[7] While arguably disagreeing with *Balding* and its progeny but ultimately deciding the case on other grounds, the *Garcia-Torres* court merely acknowledged that "[m]ost courts that have addressed constitutionality of cheek swabs have concluded that a cheek swab is a 'search' for the purposes of the Fourth Amendment." *Id.* at 1232. Although *Balding* has not been overruled, we are unaware as to how our supreme court may resolve this issue in the future.

grace of our alternate misdemeanor sentencing statute possesses a significantly greater expectation of privacy than a convicted felon such that the compulsory collection of his DNA sample would violate the Fourth Amendment. More importantly, we are compelled to note that "[t]he touchstone of the Fourth Amendment is reasonableness." *Shotts v. State*, 925 N.E.2d 719, 723 (Ind. 2010). Indeed, the amendment itself "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The exclusionary rule rendering evidence obtained through an illegal search or seizure inadmissible at trial is a judicially created remedy designed to safeguard the right of people to be free from "unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Thus, the sole purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Davis*, __ U.S.__, 131 S. Ct. at 2426.

In *Evans*, the Supreme Court held that "[t]he exclusionary rule does not require suppression of evidence seized in violation of the Fourth Amendment where the erroneous information resulted from clerical errors of court employees." *Evans*, 514 U.S. at 10. Specifically, the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees. *Id*. Here, even assuming that Anderson had a greater expectation of privacy than those to which Indiana Code Section 10-13-6-10 was intended to apply, and thus the collection of his DNA violated his Fourth Amendment rights, exclusion of the DNA evidence would serve no deterrent purpose. The buccal swab here was

---

[8] Interestingly, the *Balding* court repeatedly refers to a convicted "offender" as opposed to specifically a convicted "felon." However, as it stands, Indiana Code Section 10-13-6-13 requires DNA samples only from persons "convicted of a felony," "conspiracy to commit a felony," "attempt to commit a felony," or "burglary."

performed and the DNA was collected due to an unintentional mistake by a court and its employees when it issued an erroneous order of probation and abstract of judgment. As such, exclusion was unnecessary and admission of the evidence did not violate Anderson's Fourth Amendment rights.

### C. The Mistake Exception and the Indiana Constitution

Although Article 1, Section 11 of the Indiana Constitution tracks the Fourth Amendment verbatim, the Indiana provision in some cases confers greater protections to individuals than the Fourth Amendment affords and focuses on what was "reasonable" under the "totality of the circumstances." *Shotts*, 925 N.E.2d at 726. However, Anderson offers us no rationale, and we can find none for concluding that the Indiana Constitution demands a different result here. Indiana search and seizure jurisprudence, like Fourth Amendment doctrine, identifies deterrence as the primary objective of the exclusionary rule. *Membres v. State*, 889 N.E.2d 265, 273 (Ind. 2008). As stated, exclusion of Anderson's DNA evidence would serve no deterrent purpose, as it was collected inadvertently as the result of an unintentional mistake by the court and court employees. Accordingly, admission of the evidence did not violate Anderson's rights pursuant to the Indiana Constitution.

### III. Sentencing

Anderson next contends that the trial court abused its discretion when it sentenced him. Sentencing decisions are within the sound discretion of the trial court and are reviewed only for an abuse of that discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. An abuse of discretion occurs if the decision is clearly

20

against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in sentencing by failing to enter a sentencing statement, entering a sentencing statement that explains reasons for imposing a sentence which the record does not support, omitting reasons that are clearly supported by the record and advanced for consideration, or giving reasons that are improper as a matter of law. *Id.*

Anderson argues that the trial court abused its discretion by finding an aggravating factor not supported by the record and failing to find a mitigating factor that was clearly supported by the record. Regarding aggravating factors, the trial court found the "extremely violent nature of this offense" as an aggravating circumstance. Tr. at 1001. First, the facts and circumstances surrounding Pepper's murder clearly support a finding that the murder was extremely violent. Her stab wounds were almost too numerous to count, and several of the wounds were inflicted so violently that any one of them could have been fatal.[9] Indeed, Anderson does not challenge the three additional aggravating factors found by the trial court, which included his criminal history, prior probation violation, and past illegal substance abuse. A single aggravating circumstance is sufficient to justify a sentence enhancement. *Williams v. State*, 891 N.E.2d 621, 633 (Ind. Ct. App. 2008). Accordingly, even if a

---

[9] Anderson disputes the evidentiary support for the trial court's additional statement that he was "so excited by the act of murdering Jane Pepper that he became erect and had to relieve that erection through a sexual attack on Jane Pepper's body." Tr. at 1001. We agree that there was no evidentiary support for this statement. Nevertheless, the facts and circumstances surrounding the murder itself support the trial court's general finding in aggravation as to the extremely violent nature of the offense, and we will not disturb that finding.

21

sentencing court improperly applies an aggravating circumstance, but other valid aggravating circumstances exist, a sentence enhancement may still be upheld. *Id*.

Regarding the sole mitigating factor, Anderson argues that although the trial court specifically found his long history of mental illness as a mitigator, the court seemed to entirely discount the mitigating relevance of this factor. Anderson's argument in this regard is merely a challenge to the weight given to his mental illness. This argument is not available on appeal. The trial court is no longer obligated to weigh mitigating and aggravating factors when imposing sentence, and thus the trial court cannot be said to have abused its discretion in failing to assign proper weight to certain factors. *Anglemyer*, 868 N.E.2d at 491. Accordingly, Anderson has established no abuse of discretion.

As a final matter, Anderson requests that we review the appropriateness of his sentence. Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this Court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

We have already reversed two of Anderson's convictions and vacated twenty-three years of Anderson's sentence, leaving him with a sixty-five year sentence for murder.

Indiana Code Section 35-50-2-3 provides that a person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Under the circumstances presented here, we cannot say that the maximum sixty-five year sentence is inappropriate. Pepper's murder is one of the most disturbing that we have encountered. As noted earlier, this crime was incredibly violent. The brutal and random nature of Anderson's murder of Pepper supports the trial court's imposition of the maximum penalty available. Moreover, Anderson does not persuade us that his character warrants a lesser sentence. While we acknowledge his history of mental illness, there is insufficient evidence in the record connecting Anderson's mental illness to his commission of this murder. Anderson has failed to meet his burden to show that his sixty-five year sentence is inappropriate.

In sum, we affirm Anderson's conviction and sentence for murder. We reverse his convictions for burglary and abuse of a corpse and vacate those sentences. As noted earlier, the State may retry Anderson for those offenses if it so chooses.

Affirmed in part, reversed in part and remanded.

MAY, J., and BROWN, J. concur.