## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 13 2020, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Thomas Lowe
Lowe Law Office
New Albany, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Braidan Coy,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

November 13, 2020

Court of Appeals Case No.
20A-CR-358

Appeal from the Floyd Superior
Court

The Honorable Susan L. Orth,
Judge

Trial Court Cause No.
22D01-1904-F3-706

**Crone, Judge.**

# Case Summary

[1] Braidan Coy appeals his conviction for level 1 felony attempted murder, arguing that the admission of a redacted video of his police interview resulted in reversible error. First, he contends that the trial court abused its discretion in admitting the video because he was not afforded meaningful consultation with his parent as required by the juvenile waiver statute, Indiana Code Section 31-32-5-1, and therefore the waiver of his constitutional rights was invalid. Second, he contends that the admission of the video constitutes fundamental error because neither he nor his mother knowingly and voluntarily waived his constitutional rights. Because Coy has failed to provide a record from which we can adequately address these claims, we conclude that they are waived. Therefore, we affirm.

# Facts and Procedural History

[2] On February 27, 2019, seventeen-year-old Coy spent the day with his friend John Wheeler, who drove a silver Ford F150 pickup truck. Around 9:00 or 9:30 p.m., Wheeler drove them to Wheeler's New Albany home, where he lived with his mother Brandi Spencer and her husband. Wheeler and Coy decided to sleep in Wheeler's truck, which they often did. Spencer was home and saw them come inside the house to get some blankets. Coy and Wheeler then returned to the truck, which was parked in an area off a paved roadway adjacent to his house. They sat in the truck talking about Wheeler going into the Marines and Coy going to Colorado, with Wheeler sitting in the driver's seat wrapped in a blanket, and Coy sitting in the passenger's seat. Wheeler

decided to go to sleep, and he put his glasses on the dashboard, but he did not take off his hat.

[3] Wheeler woke up when he felt something running down the right side of his neck. He put his hand to his neck and felt something warm shooting out of his neck. Coy was sitting in the passenger's seat, looking at Wheeler. Wheeler asked Coy for help, but Coy said, "I don't know what to do[,]" and left. Tr. Vol. 4 at 38. Wheeler located his cell phone on the center console and made a 911 call at about 10:00 p.m. Wheeler was able to communicate to the dispatcher that he needed an ambulance, but he was unable to give his address. The 911 dispatcher used the phone number that Wheeler was calling from to determine his address, and police were dispatched to Wheeler's home. While Wheeler was waiting for help, he kept his hand on his neck, and he tried to reach for his first aid kit in the passenger-side door. Then, he lost consciousness.

[4] New Albany Police Officer Ronald Gaines was the first to arrive at Wheeler's home. As Officer Gaines arrived, he noticed a silver Ford F150 pickup on the side of the road. Officer Gaines and another police officer went to the home's front door and spoke with Spencer, who seemed puzzled and asked why the police were there. Officer Gaines explained that a male had made a 911 call and told Spencer the last four digits of the phone number that had made the call. Spencer recognized the number as Wheeler's, but her attempts to call and text him were unsuccessful. The officers asked Spencer about Wheeler's vehicle, and she told them that he drove a silver Ford. The officers then asked

her whether they could check on the silver Ford that Officer Gaines had noticed, and she agreed.

[5] As the two officers and Spencer walked toward the truck, one of the officers pointed his flashlight at the truck, and the truck horn sounded. They ran to the truck, but the driver's-side door was locked, and the truck's windows were fogged up. Officer Gaines went around to the passenger's side and saw blood on the outside of the door near the handle. He found that door unlocked, opened it, and saw someone in the driver's seat and blood on the inside of the truck. Officer Gaines unlocked all the truck's doors by pressing the unlock button on the inside of the door and returned to the driver's side.

[6] The officers opened the driver's-side door and found Wheeler slumped over and "covered in blood." Tr. Vol. 2 at 176. He was wrapped in a blanket and wearing a hat. Although Wheeler was conscious, he was unable to speak or help the officers as they removed him from the truck. As Officer Gaines lifted Wheeler out of the truck and laid him on the ground, Officer Gaines saw a five- to six-inch stream of blood pouring out of Wheeler's neck. Officer Gaines believed Wheeler's carotid artery had been injured and pinched the artery to stem the bleeding. One of the officers asked Wheeler if he had been shot or stabbed, and Wheeler made a stabbing motion. When EMTs arrived, they examined Wheeler for injuries and found a knife in a leather sheath hanging from his belt on his left hip. Because patients are not transported with weapons, the EMTs removed the knife and gave it to Officer Gaines.

[7] Wheeler was taken to a hospital emergency room, where doctors found that his carotid artery had been severed, which is a life-threatening injury. Doctors also found that Wheeler's vagus nerve, which controls muscles that affect speech, had been severed. Toxicology screens are regularly performed on patients entering the emergency room, but Wheeler's hospital records do not contain any positive screens for alcohol. Due to the severity of his injuries, Wheeler suffered a stroke that night, leaving the left side of his body paralyzed. Wheeler remained in the hospital for two weeks and was then transferred to a rehabilitation facility for therapy to help him regain control of the left side of his body.

[8] Meanwhile, police found another knife, identical to Wheeler's, on the driver's-side floorboard of the truck. The second knife was "heavily stained" with blood. Tr. Vol. 3 at 200. Police later learned that Coy and Wheeler had bought the knives together, so that they could have matching knives. Tr. Vol. 4 at 2, 29-30, 110-11. Photographs of the truck show blood on the steering wheel, passenger's-side dashboard and door, and the outside of the front passenger door near the door handle; blood-stained blankets on the driver's side; eyeglasses lying on the center of the dashboard; a phone cord lying on the truck's console; a hat lying on the passenger's side of the dashboard; and a partially filled cup with a lid and straw attached sitting in a cup holder affixed to the center of the truck's dashboard. Subsequent DNA testing of blood samples showed that the blood was Wheeler's.

[9]     On February 28, 2019, at 6:00 a.m., Mitzie Browning found Coy sleeping in the hallway outside her apartment.  She recognized him as an acquaintance of her daughter Carrie Pettay.  Browning woke up Coy and drove him to the apartment where he lived with his mother Cynthia Coy.

[10]     As police continued to investigate what led to Wheeler's injury, they learned Cynthia's phone number and address.  New Albany Police Detective Carrie East located Coy at that address and brought him to the New Albany Police Department.[1]  Tr. Vol. 3 at 65-67.  Coy was handcuffed and placed in an interview room, which was equipped with a video recording device.  Coy's police interview was recorded, and a redacted version was admitted at his trial and published to the jury as State's Exhibit 13.

[11]     Exhibit 13 shows that for approximately forty minutes, Coy waited in the interview room for his mother to arrive.  During that time, Detective East entered the room to swab Coy's fingers and bring him a sandwich and a drink.  While she was swabbing his fingers, she asked him whether he was on probation and whether he was right-handed.  Coy's mother finally arrived, and she and Coy spoke privately for about three minutes in the room, but that three-minute section was redacted for trial.  The video resumes when Detective East reentered the room and began the interview.  Detective East advised Coy and

---

[1]  The State incorrectly asserts that Detective East brought both Coy and his mother to the police station.  It is clear from the video of Coy's police interview that his Mother was not with him when he was brought to the station and did not arrive until at least forty minutes later.

his mother of Coy's *Miranda* rights, and Coy and his mother executed a waiver of juvenile *Miranda* rights.[2]  Detective East then asked Coy to tell her what he did the previous day.  Coy stated that he was with Wheeler early the previous day, but Wheeler dropped him off at an unknown address around 2:00 or 3:00 p.m.  Coy also said that around 6:00 or 7:00 p.m., he walked over to Browning's apartment, received her permission to spend the night, watched a movie, and went to sleep on the couch.  About thirty minutes into the interview, Detective East informed Coy that Wheeler had been injured the previous day and that an eyewitness placed Coy with Wheeler twenty minutes before the 911 call.  Coy then told Detective East that he and Wheeler were drinking in Wheeler's truck, and as Coy was falling asleep, Wheeler put a knife to his throat, and Coy disarmed Wheeler.  Tr. Vol. 3 at 117; State's Ex. 13, 13:15-13:17.

[12]  Photographs taken after the interview reveal that Coy did not have any recent wounds or marks.  Tr. Vol. 3 at 183-88, State's Exs. 11A-Q18.  Also after the interview, Coy's clothing and shoes were confiscated.  One of Coy's shoes had blood on it, which subsequent DNA analysis identified as Wheeler's.

---

[2] Under *Miranda v. Arizona*, 384 U.S. 436 (1966), persons in custody subject to interrogation must be informed that they have "a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed." *B.A. v. State*, 100 N.E.3d 225, 230 (Ind. 2018) (quoting *Miranda*, 384 U.S. at 444).  *Miranda* warnings "safeguard the Fifth Amendment right against self-incrimination by warding off police coercion."  *Id*.

[13] On April 17, 2019, after Coy's case was waived from juvenile jurisdiction to adult jurisdiction, the State filed an information charging him with level 3 felony aggravated battery. The State later amended the information to add a charge of level 1 felony attempted murder. On August 14, 2019, Coy filed a notice of intent to claim the use of justifiable reasonable force as a defense. The trial court set a jury trial for December 9, 2019. At a motions hearing on December 4, 2019, Coy informed the trial court that he would testify in his own defense. Tr. Vol. 1 at 85-86.

[14] On the morning of December 9, 2019, Coy filed a motion to suppress his statement to Detective East on the basis that it was procured without a valid waiver of legal rights, and the trial court held a hearing on the motion. At the hearing, Coy argued that his constitutional rights were not validly waived under Indiana Code Section 31-32-5-1 because the statute requires waiver by a child's "custodial parent, guardian, custodian, or guardian ad litem," and his mother was not his custodial parent. *Id*. at 96. The State argued that pursuant to Indiana Code Section 31-9-2-31(8), "custodian for purposes of the juvenile law means a person with whom the child resides[,]" and there was no dispute that Coy was living with his mother. *Id*. at 107. The trial court took the matter under advisement and denied the motion later that day. The parties conducted voir dire, and a jury was selected.

[15] The following morning before the trial court gave the jury preliminary instructions, the parties and the court discussed the subject of stipulations to State's Exhibit 13. Tr. Vol. 2 at 99. The State's proposed Exhibit 13 began

when Coy's mother arrived in the interview room, and thus would have included the private conversation between Coy and his mother. Coy argued that the "chitter chatter" between himself and his mother prior to the execution of the waiver of his rights should be redacted. *Id*. at 105-06. Coy also argued that the forty minutes of the video during which he sat in the interview room waiting for his mother to arrive, which the State had redacted, should be admitted. Further, Coy explained that he would object to the admission of the entire exhibit on the ground that he did not have a chance for meaningful consultation with his mother. *Id*. at 107.

[16] Coy suggested that the trial court watch the section of the video containing the private conversation between himself and his mother prior to their signing the waiver of Coy's rights. *Id*. The video of that conversation was played for the court, and, apparently, the parties and the trial court had a six-page transcript of the conversation. The transcript of the in-court video replay indicates that most of the interview was indiscernible, and that section of the video was not admitted for any purpose. The trial court stated that the private conversation between Coy and his mother was not appropriate for the jury because there was some discussion of other bad acts. *Id*. at 114.[3] Further, the court granted Coy's request to include the forty-minute section of the video, during which he waited

---

[3] Some other portions of the interview after Coy and his mother signed the waiver were redacted but are not at issue in this appeal.

for his mother to arrive. The trial court then explained its ruling on Coy's motion to suppress:

> I ruled yesterday that the Motion to Suppress was denied. I wanted to [explain] the reasons for my ruling today. …. Defense contend[s] in [his] Motion to Suppress that Mr. Coy's waiver was ineffective because his mother, who along with Mr. Coy effectuated the waiver, was not his custodian at the time the waiver was entered by Mr. Coy and his mother. And that was all pursuant to Indiana Code [Section] 31-32-5-2 [sic]. … Yesterday there was not an[ ]argument before me that Mr. Coy and his mother did not have meaningful consultation, however, that was brought up today. *I am finding, especially in light of, reading the transcript this morning, that I didn't have with me yesterday, and looking at some of the video, that Mr. Coy and his mother had the opportunity for meaningful consultation, and did have meaningful consultation before executing the waiver.* So the final question before me was … whether [Coy's mother], along with Mr. Coy, had the ability to waive his constitutional rights. … [B]ased on the evidence before me, [Mr. Coy's mother is] at the least, his de[ ]facto guardian.

*Id.* at 134-35 (emphasis added) (verbal hesitations omitted).

[17] At trial, the State's witnesses included Wheeler, Spencer, Pettay, Officer Gaines, Detective East, two other police officers who investigated the case, a forensic DNA analyst, a doctor from the hospital where Wheeler was treated, and a police surgeon for the Louisville Metro Police Department. The defense argued that Coy acted in self-defense, and Coy testified on his own behalf. The jury found Coy guilty as charged. The trial court entered judgment of

conviction for level 1 felony attempted murder and sentenced Coy to thirty-three years, all executed. This appeal ensued.

# Discussion and Decision

[18] Coy challenges the trial court's decision to admit State's Exhibit 13. We review a trial court's ruling on the admission of evidence for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001).

[19] Coy asserts that Exhibit 13 should have been excluded because the State failed to show that the police complied with the juvenile waiver statute's requirement that he be afforded meaningful consultation with his mother. Section 31-32-5-1 provides in relevant part,

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
>
> …
>
> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>
> (A) that person knowingly and voluntarily waives the right;
>
> (B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver[.]

[20] "If section 31-32-5-1 is violated, 'the introduction in evidence of a statement made by a person under eighteen years of age is forbidden.'" *Stewart v. State*, 754 N.E.2d 492, 495 (Ind. 2001) (quoting *Stidham v. State*, 608 N.E.2d 699, 700 (Ind. 1993)). "The State bears the burden of proving beyond a reasonable doubt that the juvenile received all of the protections of Indiana Code section 31-32-5-1 and that both the juvenile and his or her parent knowingly, intelligently, and voluntarily waived the juvenile's rights."[4] *D.M. v. State*, 949 N.E.2d 327, 334 (Ind. 2011) (citation omitted). Our supreme court has explained,

> Indiana Code section 31-32-5-1 requires that, before a juvenile's rights are waived, he or she must be afforded an opportunity for meaningful consultation with a parent. The mere presence of a parent, standing alone, does not satisfy the statute. Rather, the consultation requirement is satisfied when the State demonstrates actual consultation of a meaningful nature or the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his or her constitutional rights. Additionally, the opportunity for the juvenile and the parent to counsel with each other must occur before the juvenile's rights are waived because the purpose of consultation is to allow the juvenile to make a decision on

---

[4] The juvenile waiver statute applies only when the juvenile is in custody and subject to interrogation. *State v. O.E.W.*, 133 N.E.3d 144, 153 (Ind. Ct. App. 2019), *trans. denied* (2020). There is no dispute that Coy was subject to custodial interrogation.

whether to waive his or her rights in a comparatively relaxed and stable atmosphere.

> To prove that actual consultation of a meaningful nature occurred, the State needs only to prove that the police provided a relatively private atmosphere that was free from police pressure in which the juvenile and the parent could have had a meaningful discussion about the allegations, the circumstances of the case, and the ramifications of their responses to police questioning and confessions. The interrogating officer cannot dictate or even recommend how they should use this time. What is important is that the child and adult be aware of and understand the child's rights in order to discuss them intelligently. Once such an opportunity is provided, it is up to the juvenile and the parent to use this opportunity to their advantage. The State need not show that the consultation was beneficial in helping the juvenile and his or her parent decide whether to waive or stand on the juvenile's rights. Rather, the extent to which the conversation aids in the waiver decision is a circumstance among many others which the trial court may consider in arriving at its decision as to whether the waiver is voluntary and knowing.

*Id*. at 335-36 (citations, quotation marks, brackets, and ellipsis omitted).

[21] The State contends that Coy has waived his argument that he was not afforded meaningful consultation with his mother because he has not provided a record adequate for appellate review. We must agree. "It is well settled that it is the appellant's burden to provide us with an adequate record to permit meaningful appellate review." *Martinez v. State*, 82 N.E.3d 261, 263-64 (Ind. Ct. App. 2017) (quoting *Wilhoite v. State*, 7 N.E.3d 350, 354-55 (Ind. Ct. App. 2014)), *trans. denied* (2018).

[22]    Here, the trial court held a full evidentiary hearing on Coy's motion to suppress his police interview, during which Coy asserted that the waiver of his *Miranda* rights was not valid because his mother was not his custodial parent, and the trial court denied his motion. The following day, Coy raised the additional argument that the waiver of his *Miranda* rights was not valid because he was not provided with meaningful consultation with his mother. At Coy's suggestion, the trial court viewed the section of the video containing Coy's private conversation with his mother. The trial court was also provided with a transcript of their conversation. Based on that section of the video and the transcript, the trial court concluded that Coy had meaningful consultation with his mother and that the waiver of his constitutional rights was valid. However, that section of the video was not admitted for any purpose, and neither it nor the transcript is in the record before us. In addition, Coy did not attempt to supplement the record as permitted by Indiana Appellate Rule 31. Therefore, we are unable to review the basis for the trial court's ruling. Because it is Coy's burden to provide a record adequate for our review, and he has failed to do so,

his claim of error is waived.[5]  *See Martinez*, 82 N.E.3d at 263-64 (failure to carry burden to provide adequate record for review of error resulted in waiver of issue); *Menifee v. State*, 600 N.E.2d 967, 969 (Ind. Ct. App. 1992) (same), *clarified on denial of reh'g*, 605 N.E.2d 1207 (1993).

[23]  Waiver notwithstanding, even if the trial court abused its discretion by admitting Coy's police interview, we would conclude that any error was harmless.  We observe that statements obtained in violation of constitutional rights are subject to a constitutional harmless error analysis.  *Coleman v. State*, 750 N.E.2d 370, 374 (Ind. 2001) (citing *Arizona v. Fulminante*, 499 U.S. 279, 296, 306-12 (1991)).  Under this harmless error analysis, the reviewing court must be satisfied that the error did not contribute to the verdict, that is, that the

---

[5] Although Coy has waived his claim, we note that the record appears to show some potentially problematic aspects in the procedure used by the police to obtain Coy's waiver of rights.  Our supreme court has set forth the proper procedure:

> First, both the juvenile and the parent or guardian must be informed of the right to an attorney and the right to remain silent.  Second, the juvenile must be given a meaningful opportunity to consult with his [or her] parent, guardian or attorney about the waiver decision.  A meaningful opportunity for the parent-juvenile consultation requires timeliness: … the consultation must occur after the advisement of rights but prior to the decision to execute a waiver and make a statement.

*D.M.*, 949 N.E.2d at 342 (quoting *Douglas v. State*, 481 N.E.2d 107, 111 (Ind. 1985)).  That procedure does not appear to have been followed here.  We also note that there are circumstances in which this Court has found that a child was not provided meaningful consultation where the consultation occurred in the presence of active surveillance equipment.  *See J.L. v. State*, 5 N.E.3d 431, 439 (Ind. Ct. App. 2014) (concluding that meaningful consultation did not occur where video camera in interview room was never turned off and officer did not offer to leave room to allow juvenile and parent to talk); *S.D. v. State*, 937 N.E.2d 425, 431 (Ind. Ct. App. 2010) (concluding that meaningful consultation did not occur where consultation was videotaped and child and parent were aware of the video cameras in the room), *trans. denied* (2011); *Bryant v. State*, 802 N.E.2d 486, 494 (Ind. Ct. App. 2004) (concluding that meaningful consultation did not occur where police secretly watched and recorded consultation), *trans. denied*.  Here, the consultation between Coy and his mother was recorded, although it is unknown whether they were aware that there was active video recording equipment in the room.  Finally, Coy and his mother were not informed of the reason Coy had been brought in for questioning until well after they signed his waiver of rights.

error was unimportant in relation to everything else the jury considered on the issue in question. *Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001). In other words, "if the State has presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless." *Anderson v. State*, 961 N.E.2d 19, 28 (Ind. Ct. App. 2012), *trans. denied*. Although the record is inadequate for us to review the trial court's conclusion that Coy was provided with meaning consultation with his mother, it is adequate for us to perform a harmless error analysis.

[24] Coy contends that his statement to Detective East was critical to the State's case, but our review of the record reveals that there was ample independent evidence of Coy's guilt. Spencer testified that she saw Coy with Wheeler twenty minutes before Wheeler called 911. When police found Wheeler, he indicated that he had been stabbed. An EMT found a knife in a sheath in Wheeler's possession, and police found a matching knife heavily stained with Wheeler's blood on the floorboard of the driver's side of the truck. Wheeler testified that he and Coy bought the knives together so that they would have matching knives. Wheeler also testified that the night he was injured, Coy was with him when Wheeler fell asleep in his truck, Wheeler awoke bleeding copiously from the right side of his neck, Coy was sitting in the passenger's seat looking at Wheeler, Wheeler asked Coy for help to no avail, and Coy left him there bleeding. Wheeler's blood was found on the outside of the truck's front passenger door, which Coy would have used to exit the truck, and on Coy's shoe. Thus, even without Coy's police interview, there was overwhelming

evidence that Coy inflicted a life-threatening injury to Wheeler and intended that he die.

[25] As for Coy's claim that he acted in self-defense, we observe that "[a] valid claim of self-defense is legal justification for an otherwise criminal act." *Mayes v. State*, 744 N.E.2d 390, 393 (Ind. 2001). Coy testified that he threw up his hands in self-defense when he realized that Wheeler was holding a blade to his neck. Coy's trial testimony mirrors the explanation that he gave to Detective East that he disarmed Wheeler when Wheeler put a knife to his throat. Coy contends that the trial court's decision to admit his police interview impacted his decision to testify and his trial strategy, implying that he would not have testified if his police interview had not been admitted. However, this argument contradicts the fact that Coy filed a notice of self-defense and informed the trial court that he would testify even before he filed the motion to suppress the police interview. Further, other than his trial testimony and the police interview, Coy directs us to no other evidence that he acted in self-defense. Given the eyewitness and physical evidence, Coy's testimony was integral to his self-defense strategy in order to show a "legal justification for an otherwise criminal act."[6] *See Mayes*, 744 N.E.2d at 393.

---

[6] Coy argues that "much of the State's closing argument was consumed" with his police interview. Appellant's Br. at 20. We cannot agree with that characterization of the State's closing argument given that the State addressed Coy's statement that he defended himself when Wheeler put a knife to his throat, which is the same account that Coy testified to at trial. Coy also complains that the State "played" the police interview for an hour and forty-five minutes, ignoring the fact that at least forty minutes of it was included at Coy's request. *Id.*

[26] Our review of the record shows that the State introduced ample evidence to rebut Coy's claim of self-defense, including Wheeler's testimony, described above, and the physical evidence, which supports Wheeler's testimony and not Coy's self-defense account. There were no signs of a struggle in Wheeler's truck to support Coy's claim that he had to disarm Wheeler. The location of Wheeler's blood in the truck showed that Wheeler bled in the driver's seat, and the blood stains found on the passenger side support his testimony that he tried to reach his first-aid kit in the passenger-side door. A surgeon with extensive experience testified that a knife put in contact with a person's neck would leave a mark, and that a struggle would generally produce defensive wounds, but the evidence showed that Coy did not have any defensive injuries. Coy testified that he and Wheeler had been drinking, but Wheeler testified that he had not been drinking, and his medical records did not include any positive toxicology screens for alcohol. Therefore, based on the overwhelming evidence of Coy's guilt, we conclude that any error in the admission of the police interview is harmless beyond a reasonable doubt.

[27] Coy also argues that the admission of State's Exhibit 13 constitutes fundamental error because neither he nor his mother knowingly and voluntarily waived his *Miranda* rights. For the reason given above, Coy has waived this argument by failing to provide a record adequate for meaningful appellate review. Accordingly, we affirm Coy's conviction.

Affirmed.

Robb, J., and Brown, J., concur.