Edward POWELL, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0802–CR–95.

Court of Appeals of Indiana.

Dec. 11, 2008.

Transfer Denied Feb. 26, 2009.

Anna E. Onaitis, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ann L. Goodwin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

VAIDIK, Judge.

### Case Summary

While searching Edward Powell incident to his arrest for several crimes, an Indianapolis police officer felt an object in the seat of Powell's underwear. Because the officer could not access the object, and because Powell was wearing droopy pants that exposed most of his underwear, the officer, careful not to reveal Powell's skin, used a pocket knife to remove an eight-inch section of Powell's underwear and found cocaine enclosed in a fabric pocket. Powell then filed a motion to suppress the cocaine as well as statements he made to detectives during a custodial interview after allegedly requesting an attorney and invoking his right to remain silent. The trial court denied his motion, and Powell

now brings this discretionary interlocutory appeal. Concluding under the factors enunciated in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)— scope of intrusion, manner of search, justification for search, and place conducted— that the search of Powell's person was reasonable under the Fourth Amendment and finding no other constitutional violations, we affirm the trial court's denial of Powell's motion to suppress.

## Facts and Procedural History

On January 23, 2007, Indianapolis Metropolitan Police Department Officer Paul Thompson was on routine patrol when he observed Powell fail to stop for a red light at the intersection of Rural Street/Keystone Avenue and Massachusetts Avenue. He activated his emergency lights and pulled Powell over. Officer Thompson ran a computer check and learned that Powell's driver's license was suspended. By this time, another officer arrived on the scene, and both officers approached Powell's car, instructed him to turn it off, and told him that he was under arrest for driving while suspended. At this point, Powell depressed the accelerator, making his engine race. As Officer Thompson tried to turn off Powell's vehicle, Powell attempted to put his vehicle into gear. However, the other officer was able to enter Powell's vehicle through the other side and turn it off.

Powell was removed from the vehicle, handcuffed, and taken to the side of the road. A holster was found in his possession. Powell then told the officers that he had a gun, which was located under the driver's seat of his vehicle. Incident to his arrest for charges which now included driving while suspended, possession of a handgun, criminal recklessness, and fleeing, *see* Tr. p. 25–26, Officer Thompson patted down Powell, feeling what seemed to be some type of object in the seat of his underwear. At the time, Powell was wearing very droopy pants, which he wore down below [his] buttocks, exposing [his] underwear. *Id.* at 16, 17.[1] Officer Thompson explained that the object was smaller than his fist and similar to a small rock. *Id.* at 17. Officer Thompson thought that it was necessary to remove the unknown object for officer safety before transporting Powell. Because of the object's curious position, Officer Thompson ultimately decided to cut it out of Powell's underwear, which he was able to readily access because of the low position in which Powell was wearing his pants. Using a pocket knife, Officer Thompson cut out an eight-inch section of Powell's underwear and removed the object, which was later determined to be cocaine. During this process, Officer Thompson did not expose any of Powell's skin. After removing the object, Officer Thompson was better able to understand how the object was hidden in Powell's underwear:

Q: And when you removed that section of underwear, what was the item enclosed in basically a pocket within the underwear?

A: That's what it appeared to me. Was some type of a pocket.

Q: So there was fabric on each side. It was not loose?

A: Yes. Id. at 20.

This event took place around 9:00 p.m. on a sidewalk near the intersection of I–70 and Rural Street/Keystone Avenue. Powell's vehicle and the patrol cars were parked in front of them, and a building

---

1. It is unclear whether Powell's pants came down at any point during the process. When asked if he pulled Powell's pants down, Officer Thompson responded: If his pants came down around his ankles, it was due to the style and fashion that he was wearing them in. We didn't pull his pants down. Tr. p. 18 (emphasis added).

was located behind them. According to Officer Thompson, exposure to the public was minimized. In fact, Officer Thompson did not see any people pass by.

After his arrest, Powell was transported three miles to the ATF Field Office in downtown Indianapolis for questioning. After reading Powell his *Miranda* rights, ATF Task Force Agents Chris Reed and Brad Nuetzman interviewed him. Early in the interview, Powell admitted that the gun found in his vehicle belonged to him. Approximately halfway through the interview, the following exchange took place:

Powell: Man do I gotta keep talking man?

Reed: No, you don't have to.

Powell: Yeah, I'm ready to cut this off cause, I mean I feel like ya'll getting ready start asking me some crazy questions, you know what I'm saying.

Reed: Well it's totally up to you, I can't force you to talk to me. All I'm trying to do is get your side of the story and like I told you when I walked in here, if you want I can totally go with the officers to tell me. But I can tell you, what I do know, and I'm not trying to alter your decision, is you're a convicted felon in charge, in possession of a handgun, which is a federal offense.

Powell: Un huh.

Ex. p. 32. Detective Reed and Powell then discussed Powell's criminal history, the possible charges he faced, and the sentencing ranges for those charges. After Detective Reed asked Powell if he wanted to stop it right now, Powell said, I mean what do you wanna know though? *Id.* at 33. Powell continued to speak with Detective Reed and complained that he had been slapped by an officer at the scene of his arrest. Detective Reed and Powell also had the following conversation:

Reed: Okay. Like I said, I'm not here to force you to talk to me, I'm here to get your side of the story.

Powell: Okay.

Reed. If you want to talk to me great, if you don't you can go down to County, then I just have to rely on their story.

Powell: I'm saying, so what else you wanna know, besides what they tell you?

*Id.* at 35.

Later in the interview, the following exchange took place:

Powell: Could I see a about getting a lawyer or something man?

Reed: You want an a, so you wanna stop talking to us and you want an attorney, is that what you're telling me?

Powell: I mean I thought ya'll was, ya'll said ya'll ATF, I thought ya'll was coming to ask me questions about a gun.

*Id.* at 43–44. Powell then denied knowledge about the suspected cocaine found in his underwear and continued speaking with the detectives about where he purchased the gun.

Powell later expressed his opinion that Detective Reed was attempting to make him incriminate himself. *Id.* at 56. Powell also reiterated that an officer had slapped him at the scene of his arrest. The following exchange then occurred:

Powell: Man I'm done man.

Reed: I mean if you don't really wanna, if you really don't wanna talk to me I, you know, I'll quit wasting your time.

Powell: This Indianapolis, I mean ya'll can't be that naïve . . . .

Reed: I'm not naïve about nothing, that's why . . . .

Powell: It's drug up and down every main street . . . in this ragged city ——

 * * * * * *

Reed: And we try to get 'em one at a time, but, you know ——

Powell: I'm saying so why would you have to ask me a question that you know the answer to? You know that ... we can walk into a liquor store and buy guns, you know that, ya'll know that man, come on now.

*Id.* at 57. Detective Reed reiterated that Powell could cease the interview, to which Powell replied, Man we can talk about anything. I don't know nothing about no crack in my a* *, next question. *Id.* at 60. After the interview concluded, Powell explained to the detectives why he was not more forthcoming with information during the interview, I plead the fifth on that bro. *Id.* at 72. Detective Reed then doubted Powell's explanation, stating: That's fine, but before you were going, 'man I don't know about none of that.' *Id.* at 73. Powell reluctantly agreed the explanations were different. Detective Reed then shut off the tape recorder and left the room. Detective Nuetzman and Powell, however, continued speaking.

The State charged Powell with Class A felony dealing in cocaine, Class C felony possession of cocaine, Class C felony possession of cocaine and a firearm, Class C felony carrying a handgun without a license, Class A misdemeanor resisting law enforcement, and Class A misdemeanor driving while suspended. Powell then filed a motion to suppress the cocaine found on his person pursuant to the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Indiana Constitution and a motion to suppress the statements he allegedly made during the interview after he requested counsel and asked to cease questioning pursuant to the Fifth and Sixth Amendments of the United States Constitution and Article I, Sections 13 and 14 of the Indiana Constitution. Following a hearing, the trial court denied Powell's motion to suppress. As for the search of Powell's person, the trial court explained:

Something was felt in his pants. I'm not sure if his pants were—fell down by themselves or if they were taken down. But they were—even when they were on him they were below the belt li[n]e and that was exposing his underwear at that point. That they felt something that in his pants in a pocket that was sown in his pants, in his underwear I mean. They took out a pocket knife, cut the opening to the package and—or the pocket and found cocaine inside of it. That this was on the street at Keystone and Rural. And that it was 9:00 PM at night. And it was dark. My review of the cases and I've been involved in a couple of these case[s] that got taken up. Is that in this case I do not believe that that was a strip search and I do not believe that it was inappropriate and I do not believe that anybody—there was any evidence that anybody was even around or saw it. Yes, it was on the street but it was dark[.] It was at night. The officer testified that he didn't remember seeing anybody around. And so I find that that was not outside the purview of their right to search based on the arrest and the circumstances.

Tr. p. 57–58. As for Powell's request for an attorney, the trial court explained:

[T]here were about three instances that were directed to the court in my review of the transcript of the statement where Mr. Powell at—with various degrees, kind of got tired of talking to them. And either said that he didn't want to talk to them or said should I get a lawyer. Discussions were held after that, not really questions, but rather about that. And then they continue talking. My review of this indicates that I don't believe that he made a[n] unequivocal request to stop talking and that he required a lawyer. I find that the defendant's criminal history in this

case, which is mentioned in the statement itself of at least four prior felony convictions, does not make him a neophyte in the system and that if he had wished to assert—actually assert and be firm about his right to a lawyer he certainly knew what he had to do. Id. at 59. Upon Powell's request, the trial court certified its order for interlocutory appeal, and this Court accepted jurisdiction.

### Discussion and Decision

Powell contends that the trial court erred in denying his motion to suppress the cocaine found on his person and the incriminating statements he made to the detectives during the custodial interview after he allegedly requested an attorney and asked to cease the questioning. Our standard for reviewing the denial of a motion to suppress is well settled. We review such rulings in a manner similar to other sufficiency matters. State v. Quirk, 842 N.E.2d 334, 340 (Ind.2006). We do not reweigh the evidence, and we consider conflicting evidence most favorable to the ruling. Id. Unlike typical sufficiency reviews, however, we will consider not only the evidence favorable to the judgment but also the uncontested evidence favorable to the defendant. Quinn v. State, 792 N.E.2d 597, 599 (Ind.Ct.App.2003), trans. denied.

### I. Search of Powell's Person

#### A. Fourth Amendment

■■■ Powell contends that the trial court erred in denying his motion to suppress the cocaine because the search of his person violated the Fourth Amendment. The Fourth Amendment protects people from unreasonable searches and seizures, and this protection has been extended to the states through the Fourteenth Amendment. Taylor v. State, 842 N.E.2d 327, 330 (Ind.2006). For a search to be reasonable under the Fourth Amendment, a warrant is required unless an exception to the warrant requirement applies. Id. The State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement. Here, Powell concedes that he was searched incident to a lawful arrest, which is an exception to the warrant requirement. See Edwards v. State, 759 N.E.2d 626, 629 (Ind. 2001).

■■■ Powell argues, however, that the nature and scope of the search exceeded what is permissible under the Fourth Amendment. As our Supreme Court acknowledged in Edwards:

The United States Supreme Court has held that once a lawful arrest has been made, authorities may conduct a full search of the arrestee for weapons or concealed evidence. United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). No additional probable cause for the search is required, and the search incident to arrest may " 'involve a relatively extensive exploration of the person." ' Id. at 227, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (quoting Terry v. Ohio, 392 U.S. 1, 25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Nonetheless, such a search would be unreasonable, and therefore a violation of the Fourth Amendment standard, if it were extreme or patently abusive. Id. at 236[, 94 S.Ct. 467], 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427.

759 N.E.2d at 629. In addition, the United States Supreme Court examined the reasonableness of inmate strip searches under the Fourth Amendment in Bell v. Wolfish and articulated the following test:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balanc-

ing of the need for the particular search against the invasion of personal rights that the search entails. *Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.* 441 U.S. at 559, 99 S.Ct. 1861 (emphasis added).

■ On appeal, the State argues that the four *Bell v. Wolfish* factors *only* apply to strip searches, which this case does not involve.[2] However, after the *Bell* court articulated the four factors, it cited six cases for support (including *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), which notably are not strip search cases. This leads us to believe that the factors apply generally to Fourth Amendment searches, not just strip searches. We thus apply them here.

■ As for the justification for Officer Thompson's search of Powell, the pat down was performed pursuant to Powell's lawful arrest for numerous crimes, which included possessing a gun and attempting to flee from the officers. Officer Thompson felt an object in the seat of Powell's underwear and wanted to remove it for officer safety before transporting Powell. At the time of the pat down, Powell was wearing droopy pants below his buttocks, which exposed his underwear. Tr. p. 17. In fact, Officer Thompson [c]ould access most of [Powell's] underwear from the way that he was wearing his pants. *Id.* at 18. Officer Thompson conducted the pat down in the usual

manner until he couldn't figure out how to get [the object] out. *Id.* at 19. As such, Officer Thompson used a pocket knife to remove an eight-inch section of Powell's underwear. Though the scope of the intrusion seems unreasonable at first blush, given that Powell was wearing his pants low, thereby exposing his underwear by his own doing, and the cocaine was kept in a pocket-type enclosure with material on both sides, Officer Thompson was able to remove the cocaine from Powell's underwear without exposing any of Powell's skin. Moreover, this occurred around 9:00 p.m. on a sidewalk near the intersection of I–70 and Rural Street/Keystone Avenue. Three vehicles were in front of Powell and the officers, and a building was located behind them. This did not occur in a residential area, thereby minimizing exposure to the public. Although Officer Thompson could not recall any vehicular traffic, he testified that no people walked by. Given the scope of the search of Powell, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted, we conclude that the search was reasonable under the Fourth Amendment.[3]

### B. Article I, Section 11

■ Powell also contends that the search of his person violated Article I, Section 11 of the Indiana Constitution, which has a separate analysis from the Fourth Amendment. We construe Section 11 liberally in favor of protecting individuals from unreasonable intrusions on their privacy. *Grier v. State*, 868 N.E.2d 443,

---

**2.** We point out a distinction between this case and the typical strip search case. In this case, Officer Thompson felt a foreign object on Powell and tried to determine the least offensive way of removing it, while in a strip search, the searching officer does not necessarily know that he is going to find an object.

**3.** We also note that at no time during the custodial interview did Powell complain about his underwear being cut. This is especially notable given that several pages of the transcript of Powell's interview are devoted to Powell's wardrobe.

444 (Ind.2007) (citing *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind.2002)). But respect must also be accorded our citizens' concerns for safety, security, and protection. *Id.* (citing *Holder v. State*, 847 N.E.2d 930, 940 (Ind.2006)). In assessing the reasonableness of a search or seizure under the totality of the circumstances, consideration must be given to the interests of the individual affected and those of law enforcement. *Id.* In particular, we consider: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs. *Id.* (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind.2005), quoted in *Holder*, 847 N.E.2d at 940; *Trimble v. State*, 842 N.E.2d 798, 803 (Ind.2006)).

■ For the same reasons as above, we conclude that the search of Powell was reasonable in light of the totality of the circumstances. That is, Powell, who had been arrested for numerous crimes and was being patted down pursuant to those arrests, was wearing his pants in a droopy fashion such that his underwear was exposed. Officer Thompson, who could access most of Powell's underwear from the way in which he was wearing his pants, could not figure out how to access the object. So, he used a pocket knife to remove an eight-inch section of Powell's underwear. The cocaine was contained in the fabric pocket. As such, Officer Thompson was able to remove the cocaine without exposing any of Powell's skin. This occurred at 9:00 p.m. on a sidewalk in a non-residential area with cars in front of them and a building located behind them. Officer Thompson testified that he did not recall any people walking by. Under these circumstances, the search of Powell was reasonable and therefore did not violate

Article I, Section 11. Accordingly, we conclude that the trial court did not err in denying Powell's motion to suppress the cocaine found on his person.

## II. Request for Attorney and Invocation of Right to Remain Silent during Custodial Interview

■ Powell next argues that the trial court erred in denying his motion to suppress the incriminating statements he made to the detectives during a custodial interview after he requested an attorney. The right to have counsel present during an interrogation is indispensable to the protection of the Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When a suspect asserts his right to counsel during custodial questioning, the police must stop until counsel is present or the suspect reinitiates communication with the police and waives his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Although a suspect need not invoke any magic words to assert his right to counsel, his request must be clear enough for a reasonable police officer to understand the statement as a request for an attorney. *Jolley v. State*, 684 N.E.2d 491, 492 (Ind.1997). Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (quotation omitted). The level of clarity required to meet the reasonableness standard is sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.*

For example, in *Davis*, the statement maybe I should talk to a lawyer was held

not to be a request for counsel and therefore police had no duty to stop questioning Davis. *Id.* at 462, 114 S.Ct. 2350. *Davis* established that police have no duty to cease questioning when an equivocal request for counsel is made. Nor are they required to ask clarifying questions to determine whether the suspect actually wants a lawyer. *Taylor v. State,* 689 N.E.2d 699, 703 (Ind.1997).

 As quoted in the Facts section above, Powell made the following statement to the detectives, Could I see about getting a lawyer or something man? Ex. p. 33. Detective Reed then asked Powell if he wanted an attorney and the detectives to stop asking him questions, to which Powell responded that he thought they were there to ask him about the gun, not the cocaine. Discussions then resumed. The wording of Powell's statement is ambiguous and not sufficiently clear as to constitute a request for an attorney. In fact, when Detective Reed followed up and asked Powell if he, in fact, wanted an attorney, Powell did not say yes but instead said he thought he was supposed to be questioned about the gun and not the cocaine. Because Powell, at most, made an ambiguous request about getting a lawyer or something and did not clarify that he wanted an attorney when directly asked, Powell did not unambiguously assert his right to counsel such that the detectives were required to terminate the interview.[4]

 Powell next argues that the trial court erred in denying his motion to suppress the incriminating statements he made to the detectives during the custodial interview after he invoked his Fifth Amendment right to remain silent, at which point the interrogation should have terminated. This analysis is intensely fact-sensitive. *Haviland v. State,* 677 N.E.2d 509, 514 (Ind.1997), *reh'g denied.* Although there are no particular words of legal magic to cut off questioning, a suspect must do more than express reluctance to talk in order to invoke his Fifth Amendment right to remain silent, as delineated in *Miranda* and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). *Id.*

 Here, Powell points to the following statements: Yeah, I'm ready to cut this off cause, I mean I feel like ya'll getting ready start asking me some crazy questions, you know what I'm saying and Man I'm done man. Ex. p. 32, 57. Although Powell made these statements, as can be seen from the Facts section above, he continued speaking—without pause—with the detectives, even after Detective Reed told him he did not have to do so, and he made no effort to end the interview. In fact, Powell asked Detective Reed what he wanted to know. This is not the behavior of a defendant who has unequivocally invoked his Fifth Amendment right to remain silent.[5] The trial court did

---

**4.** Powell also cites Article I, Section 13 of the Indiana Constitution, but the same result obtains. *See Taylor,* 689 N.E.2d at 704 (Assuming that the same result *Miranda* and its progeny now require is also demanded by the Indiana constitutional right to counsel, an unequivocal request for counsel is necessary to require suppression of subsequent statements made while in custody, just as it is required by *Davis* to invoke the *Miranda* right to counsel.). Because Powell did not make an unequivocal request for counsel, he is not

entitled to suppression of his statements under Article I, Section 13. Powell also cites Article I, Section 14 of the Indiana Constitution but provides no separate analysis of this provision; thus, he has waived this argument. Ind. Appellate Rule 46(A)(8)(a).

**5.** Powell also cites to several statements he made during the interview wherein he expressed the opinion that the detectives were forcing him to incriminate himself, but it does not appear that these statements relate either

not err in denying Powell's motion to suppress the statements he made to the detectives during the custodial interview.

Affirmed.

KIRSCH, J., and CRONE, J., concur.

to his request for an attorney or his right to remain silent.