ATTORNEY FOR APPELLANT

Kevin J. Moser
Fort Mitchell, Kentucky

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana



FILED

Sep 02 2020, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dustin B. Crabtree,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 2, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2128<br><br>Appeal from the Ripley Circuit<br>Court<br><br>The Honorable Ryan King, Judge<br><br>Trial Court Cause No.<br>69C01-1903-F1-1 |

**Tavitas, Judge.**

## Case Summary

[1] Dustin Crabtree appeals his conviction and sentence for child molesting, a Level 1 felony. We affirm.

## Issues

[2] Crabtree presents two issues for our review, which we revise and restate as follows:

I.      Whether the trial court erred by admitting Crabtree's statement to the officers.

II.     Whether Crabtree's sentence is inappropriate in light of the nature of the offense and Crabtree's character.

# Facts

[3]     In early 2019, Crabtree and his wife ("K.C.") lived with their three children: seven-year-old P.C.; four-year-old L.C,[1] and three-year-old R.C.[2]  In January 2019, K.C. became aware of allegations that Crabtree was engaging in sexual conduct with L.C. after L.C. disclosed the conduct to her cousin.  K.C. contacted authorities.

[4]     On January 28, 2019, Kelly Bridges, a forensic interviewer at the Children's Advocacy Center ("CAC"), interviewed L.C.  L.C. disclosed to Bridges that: (1) Crabtree "trie[d] to do gross stuff to [L.C.'s] pee-pee," like "rub it"; (2) Crabtree "did it a lot of times"; (3) Crabtree used his finger to rub "[i]nside [L.C.'s] butt-crack"; (4) Crabtree "pull[ed] [L.C.'s] pants off" and "spread[] out [her] legs so he can do it even more"; (5) Crabtree had L.C. "rub [Crabtree's] pee-pee" and it felt like Crabtree was "peeing on [L.C.'s] hand"; (6) Crabtree "put[] his finger in [L.C.'s'] mouth. . . and [ ] put his pee-pee to go through in

---

[1] The charging information alleges that the offense occurred in 2018, and Crabtree narrowed the timeline to "early spring and summer" 2018.  Tr. Vol. II p. 217.  L.C. was born in July 2014; therefore, although L.C. was four years old when she disclosed the abuse, L.C. was three years old when the abuse occurred.

[2] Based on L.C.'s interview with Kelly Bridges, it appears that L.C.'s aunt, uncle, and two cousins, ages seven and five, also lived with Crabtree's family for a period of time.

[L.C.'s] mouth"; (7) Crabtree showed L.C. "sort of a naked video" on Crabtree's phone; and (8) several of these events occurred in Crabtree's and K.C.'s bed as K.C. slept in it. Tr. Vol. II pp. 109-110, 118-19, 121-22.[3]

[5] Also, on January 28, 2019, Detective Brian Earls, with the Indiana State Police, approached Crabtree outside of the family's home. Detective Earls asked Crabtree about L.C.'s allegations, and Crabtree denied any wrongdoing. During the conversation, Crabtree volunteered to take a polygraph examination before Detective Earls could propose the same. Later that evening, Detective Earls and Crabtree scheduled Crabtree's polygraph examination.

[6] On February 1, 2019, Crabtree's mother drove Crabtree to the Indiana State Police Versailles Post. Before Crabtree took the polygraph, Sergeant Rick Roseberry, the polygraph examiner, advised Crabtree of his rights. Although Sergeant Roseberry did not use the term "*Miranda* rights," as Crabtree acknowledges on appeal, the advisements were substantially the same as *Miranda* rights. Sergeant Roseberry advised Crabtree that: (1) he was free to leave at any time; (2) the interview room door was unlocked; however, the Post door was locked for officer safety and Crabtree could simply ask officers to unlock the door to leave; (3) Crabtree had the right to remain silent; (4) anything Crabtree said could and would be used against him; (5) Crabtree had the right to speak with a lawyer and have a lawyer present for questioning; (6) if

---

[3] The court reporter transcribed Bridges' CAC interview of L.C. into the trial record. We, therefore, will cite to this portion of the transcript when quoting L.C.'s testimony because L.C. did not testify in person at trial.

Crabtree was unable to afford a lawyer, one would be provided for him; (7) Crabtree could end the questioning at any point; and (8) Crabtree was voluntarily participating in questioning.

Crabtree signed a waiver of rights prior to taking the polygraph examination. The waiver stated:

> 1. By signing your name, you acknowledge that you have been read and fully understand the following rights, that no promises have been made to you and that you have not been threatened in any manner.
>
>> a. You have the absolute right to remain silent.
>>
>> b. If you give up this right, anything that you say can and will be used against you in a court of law.
>>
>> c. You have a right to talk to a lawyer before and have a lawyer present during questioning.
>>
>> d. If you cannot afford a lawyer, one will be appointed to represent you, without charge, before any questioning, if you so desire.
>>
>> e. If you decide to answer any questions, you may stop anytime that you wish.
>
> 2. You understand that since this examination is VOLUNTARY, you release and forever hold free from harm, liability, or damage to you as a result of the polygraph examination, the State of Indiana, any agency involved in this case, it's [sic] officers, and the polygraph examiner.

Ex. Vol. V p. 15.

[8] After the polygraph examination was complete, Sergeant Roseberry told Crabtree that he failed the questions regarding whether L.C.'s mouth touched Crabtree's penis. Sergeant Roseberry then questioned Crabtree. Crabtree told Sergeant Roseberry he would be willing to speak to Sergeant Roseberry further, but asked to do so on a later date. During the three-hour period in which Crabtree spoke with Sergeant Roseberry, the following occurred: Crabtree was given advisement of his rights, introductory information and explanation about the polygraph examination, and initial questions about the polygraph; Crabtree took a twenty-minute break; the polygraph examination was completed; Sergeant Roseberry ran the polygraph report; and then Sergeant Roseberry questioned Crabtree. *See* Misc. Motions Hearing Joint Exhibit A. When Crabtree asked to reschedule the interview, Sergeant Roseberry asked Crabtree if he would mind waiting while Sergeant Roseberry went to get the investigator, to which Crabtree agreed. The duration of Crabtree's entire interaction with Sergeant Roseberry was approximately three hours.

[9] Crabtree waited one minute, then Sergeant Thomas Baxter, an Investigative Squad Sergeant, came to speak with Crabtree. During the conversation with Sergeant Baxter, Crabtree stated that he had "a whole lot to think about" and asked if he could reschedule their conversation. Tr. Vol. II p. 210. Sergeant Baxter responded, "If you wanna talk later, what you need to do is probably talk to, to [Detective Earls] about that," and continued to speak to Crabtree. *Id.* After additional discussion, Crabtree inquired whether Crabtree could still go

home if he told Sergeant Baxter "what [Crabtree was] about to tell [Sergeant Baxter]." *Id.* at 215. Sergeant Baxter responded, "I think we could do that." *Id.* Crabtree then admitted that, one night, he awoke with L.C. in his bed, and L.C. was "touching" Crabtree "[w]ith her hands and her mouth." *Id.* Afterwards, Crabtree told L.C. not to mention the events to anyone else. Crabtree stated that he advised K.C. that the children could no longer sleep in the couple's bed.

[10]   After approximately twenty minutes of questioning, Sergeant Baxter thanked Crabtree. Sergeant Baxter then asked Crabtree: "There isn't anybody that knows better, the facts of what [L.C.] said, than Detective Earls. If he comes back in here, if I go get him and present him to you and he goes over what she said, will you help put this together?" *Id.* at 217. When Sergeant Baxter asked Crabtree if that was "cool," Crabtree responded affirmatively. *Id.* at 217-18. Sergeant Baxter sent a text message to Detective Earls, who appeared within moments. Crabtree again told Detective Earls that one night he awoke with L.C. in his bed touching Crabtree's penis, "and her head was down there." Tr. Vol. III p. 5. Detective Earls then questioned Crabtree for approximately forty minutes. Crabtree left the Post that night to return to his mother's home.

[11] On March 4, 2019, the State charged Crabtree with Count I, child molesting, a Level 1 felony; and Count II, child molesting, a Level 4 felony.[4] Count I was based on Crabtree performing or submitting to sexual intercourse or other sexual conduct with L.C., and Count II was based on Crabtree fondling or touching L.C. In late July 2019, the State moved to dismiss Count II, which the trial court granted.

[12] The State moved for closed circuit television testimony by L.C. in a protected persons hearing pursuant to Indiana Code Section 35-37-4-6(e)(1)(B).[5] The State moved for this hearing due to L.C.'s young age and the likely harm that L.C. would suffer if required to testify during Crabtree's jury trial. A protected persons hearing was held on July 23, 2019. During the hearing, L.C. hid in the witness box and did not reply to several questions the State asked about Crabtree. Dr. Jill Christopher, a clinical psychologist, testified on behalf of the State and stated that, based on her February 2019 evaluation of L.C., L.C. may be unable to "reasonably communicate" and may be unable to answer many questions if she was required to testify in the presence of Crabtree. Tr. Vol. II p. 110. Bridges also testified during the hearing regarding her January 2019 CAC interview of L.C. The trial court granted the State's request and concluded that,

---

[4] Crabtree was also charged on April 4, 2019, with amended Count III and Counts IV, V, VI, and VII, unlawful possession of a firearm by a serious violent felon, Level 4 felonies. On July 9, 2019, the trial court severed these counts from Counts I and II.

[5] Indiana Code Section 35-37-4-6 allows a statement or videotape of a protected person as admissible evidence in a criminal proceeding if certain conditions are met.

in lieu of L.C.'s testimony at trial, Bridges' CAC video interview of L.C. would be played for the jury.

[13] On July 16, 2019, Crabtree filed a motion to suppress statements made during questioning following the polygraph examination. In the motion, Crabtree argued that: (1) Crabtree was in custody following the voluntary polygraph; (2) Crabtree should have been re-read his *Miranda* rights after the polygraph; and (3) Crabtree's right to remain silent and right against self-incrimination under the Fifth Amendment of the United States Constitution were violated.

[14] The trial court held a hearing on Crabtree's motion to suppress, and on July 25, 2019, the trial court entered a written order denying Crabtree's motion to suppress. The trial court found that Crabtree voluntarily participated in the polygraph and was not in custody during the polygraph examination or the subsequent questioning. The trial court concluded, therefore, that Crabtree could not succeed in challenging the admissibility of the voluntary statement and denied the motion to suppress. The trial court ordered, however, that discussion of the polygraph examination and its results would not be admissible at trial.

[15] At Crabtree's July 2019 jury trial, L.C. did not testify, and instead, the video recording of Bridges' CAC interview of L.C. was played for the jury. The video of Crabtree's interview with Sergeant Baxter and Detective Earls was also played for the jury. Prior to the introduction of the interview, Crabtree renewed his objection based on the grounds contained in his prior motion to suppress.

After the State rested, Crabtree moved for a directed verdict, which the trial court denied. Finally, in its case-in-chief, the defense played the video of L.C.'s testimony at the protected persons hearing.

[16]    The jury found Crabtree guilty of Count I, child molesting, a Level 1 felony. On August 23, 2019, the trial court sentenced Crabtree to the maximum sentence of fifty years at the Indiana Department of Correction ("DOC"). In support of its sentence, the trial court found as aggravating factors: (1) Crabtree's criminal history; (2) Crabtree's violation of a position of care, custody, or control; (3) Crabtree committed several acts that went far beyond the single act to support Count I; and (4) the significant psychological and emotional impact on the victim. Crabtree's pre-sentence investigation report ("PSI") indicates convictions for: three counts of burglary, Class B felonies, and burglary, a Class C felony, in 2005. Crabtree also appears to have been sentenced in 2005 for possession of marijuana and operating on a suspended or revoked license in Kentucky; however, no additional information was included in the PSI on these offenses. Finally, Crabtree's five charges for unlawful possession of a firearm by a serious violent felon were still pending at the time the PSI was prepared. The trial court found no mitigating factors.

[17]    In its written sentencing order, the trial court concluded:

> The Court understands that this is the maximum sentence allowed by law and further understands that the maximum sentence is reserved for the worst of the worst offenders. The Court finds that the Defendant meets this test when the Defendant, a Serious Violent Felon, utilize[d] his position of

care, custody, control, and trust to molest his own three-year old daughter over via [sic] multiple acts and/or occasions, thereby resulting in significant trauma to the victim. Further, during this time, in Defendant's home, several guns were located and the Pre-Sentence Investigation [report] shows that he was using marijuana and cocaine around the time of the molests and thereafter. These facts qualify the Defendant as one of the worst of the worst offenders who did "*the most heinous thing a dad could do.*"

Appellant's App. Vol. II pp. 15-16 (emphasis in original). Crabtree now appeals.

# Analysis

## I. Admission of Evidence

[18] Crabtree argues that his statements, made under questioning after the polygraph examination concluded, were inadmissible under the Fifth Amendment to the United States Constitution. "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State,* 994 N.E.2d 252, 259-60 (Ind. 2013). "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260. "However, when a constitutional violation is alleged, the proper standard of appellate review is de novo." *Ackerman v. State,* 51 N.E.3d 171, 177 (Ind. 2016) (quotations omitted), *cert. denied.* "The State has the burden to demonstrate that the measures it used to seize information or

evidence were constitutional." *Curry v. State*, 90 N.E.3d 677, 683 (Ind. Ct. App. 2017), (citations omitted), *trans. denied.*

[19] The Fifth Amendment, incorporated to the states via the Fourteenth Amendment, guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself."[6] U.S. Const. amend. V; *Kelly v. State,* 997 N.E.2d 1045, 1053 (Ind. 2013). The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966), that, before a law enforcement officer may subject someone to custodial interrogation, the officer must advise him "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Kelly*, 997 N.E.2d at 1053. "If the officer does not so advise the subject, the prosecutor cannot use any statements the subject does make against him in court." *Id.* "The trigger to require the announcement of *Miranda* rights is custodial interrogation." *State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017).

[20] According to Crabtree, the trial court erred by admitting his statements because: (1) Crabtree was in custody and, therefore, was entitled to *Miranda* warnings; (2) Crabtree was not advised of his *Miranda* rights a second time after the

---

[6] Crabtree's motion to suppress was based only on the Fifth Amendment, and Crabtree does not make a separate Indiana Constitution Article 1, Section 14 argument in his brief. We, therefore, will only consider Crabtree's rights under the Fifth Amendment when addressing his argument. *See Abel v. State,* 773 N.E.2d 276, 278 n.1 (Ind. 2002) ("Because Abel presents no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived.").

polygraph examination ended; and (3) law enforcement violated his Fifth Amendment right against self-incrimination by failing to honor Crabtree's right to remain silent.

### *A. Custody*

[21]   Crabtree first argues that the trial court erred by determining that he was not in custody during the questioning by officers after the polygraph examination. Under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966), if Crabtree was under "'custodial interrogation,' the police were required to give him certain warnings about his rights, and the absence of those warnings precludes the use of his statements to prove guilt." *State v. Ruiz*, 123 N.E.3d 675, 679-80 (Ind. 2019) (citation omitted), *cert. denied*. Accordingly, we will consider whether Crabtree was in custody at the time of the interrogation.

[22]   "The custody inquiry is a mixed question of fact and law: the circumstances surrounding [Crabtree's] interrogation are matters of fact, and whether those facts add up to *Miranda* custody is a question of law." *Id.* at 679. "We defer to the trial court's factual findings, without reweighing the evidence; and we consider conflicting evidence most favorably to the suppression ruling." *Id.* "[W]e review de novo the legal question of whether the facts amounted to custody." *Id.*

[23]   In determining whether a defendant was in custody during an interrogation, our Supreme Court has held that, in analyzing the Fifth Amendment, a person is in custody when "two criteria" are met: (1) "the person's freedom of movement is

curtailed to 'the degree associated with a formal arrest'"; and (2) "the person undergoes 'the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Id.* at 680 (citations omitted).

### 1. Freedom of Movement

The first factor is whether Crabtree's freedom of movement was curtailed to the degree associated with a formal arrest. "[F]reedom of movement is curtailed when a reasonable person would feel not free to terminate the interrogation and leave." *Id.*

> This freedom-of-movement inquiry requires a court to examine the totality of objective circumstances surrounding the interrogation—such as the location, duration, and character of the questioning; statements made during the questioning; the number of law-enforcement officers present; the extent of police control over the environment; the degree of physical restraint; and how the interview begins and ends.

*Id.*

In *Ruiz*, our Supreme Court determined that the defendant's freedom of movement had been curtailed. The Court noted that: (1) the time and place of the interrogation was set by the detective; (2) the defendant was led by a "circuitous path" to a small, closed interview room; (3) the defendant was interviewed by two officers; (4) the officers told the defendant to "sit tight" multiple times; and (5) the police station had a "labyrinthine exit route with many obstructions to egress." *Id.* at 680-81. "Most importantly," the Court noted that "the police significantly undercut any initial message of freedom

when they dramatically changed the interrogation atmosphere" with the second, more aggressive, interrogator. *Id.* at 681. The officers did not advise Ruiz that he was not required to answer the second officer's questions; that he was not under arrest; that he could end the interrogation at any time; and that he could leave after the second officer began questioning him. Rather, the officers accused the defendant of engaging in the accused conduct; deceived the defendant by telling him that he passed a "lie-detector test"; questioned the defendant for almost an hour even though the officers knew the defendant advised he needed to pick up his daughter. *Id.* The Court concluded that "the circumstances surrounding the interrogation add up to a situation in which a reasonable person would not feel free to end the interrogation and leave." *Id.* at 682. Accordingly, the Court determined that the record supported the "conclusion that the curtailment-of-movement criterion was met." *Id.*

[26] The questioning here was much different than the questioning in *Ruiz*. Crabtree volunteered to take a polygraph examination. Sergeant Roseberry, who administered the polygraph examination, advised Crabtree that the interview room door was unlocked; however, the Post door was locked for officer safety and Crabtree could simply ask officers to unlock the door to leave. Sergeant Roseberry also advised Crabtree of his rights, and Crabtree signed a waiver of his rights.

[27] Crabtree had a three-hour interaction with Sergeant Roseberry for the polygraph examination and follow-up questioning, a twenty-minute discussion with Sergeant Baxter, and a forty-minute discussion with Detective Earls.

Although the entire interaction with the officers was lengthy, most of the time was dedicated to the voluntary polygraph examination, not the questioning at issue here. Once during his conversation with Sergeant Roseberry and once during his conversation with Sergeant Baxter, Crabtree asked to reschedule the interview. On both occasions, however, Crabtree continued talking to the officers and answering questions. Unlike in *Ruiz*, the officers' questioning was not aggressive or deceptive, and the officers did not outnumber Crabtree.[7] The interview began with Crabtree voluntarily traveling to the Post for a polygraph examination and ended with Crabtree leaving the Post with his mother.

[28] We do not find the circumstances here similar to tactics employed by the officers in *Ruiz*. The circumstances surrounding Crabtree's interrogation simply do not add up to a situation in which a reasonable person would not feel free to end the interrogation and leave. Accordingly, the curtailment-of-movement factor was not met here.

### 2. Coercive Pressures

[29] "The second custody criterion asks whether the circumstances exert the coercive pressures that drove *Miranda*." *Ruiz*, 123 N.E.3d at 682. "When the case involves the paradigm example of interrogating a suspect at a police

---

[7] Crabtree told Sergeant Baxter he could remain in the room while Crabtree spoke with Detective Earls; however, it appears from the video that Sergeant Baxter left the room.

station, the answer to this question is generally obvious, in the absence of unusual facts." *Id.* (internal citations omitted).

[30] In *Ruiz*, our Supreme Court concluded that the "station-house questioning here both resembles the *Miranda* paradigm and exhibits the coercive pressures that *Miranda* targeted." *Id.* The Court noted that the interview took place in an isolated room at the station house "with multiple officers employing various interrogation tactics for almost an hour, trying to convince their suspect to incriminate himself." *Id.* The coercive pressures used by the officers included: (1) adding a second officer who had a more aggressive style than the first officer; (2) using subterfuge and lying to the defendant; (3) telling the defendant that the conduct was "not a big deal"; (4) suggesting that if the defendant did not speak about what he had done, the officers would make things worse for him in the future; (5) telling the defendant that they knew the allegations were true; (6) engaging in a "prolonged, persistent, and accusatory questioning"; (7) and instructing the defendant to "stay put" even though he needed to pick up his daughter. *Id.* at 682-83. The Court concluded that the second custody factor was met because "[t]hese types of coercive pressures, applied in a station-house interrogation, are precisely what induced *Miranda*'s warning requirements." *Id.* at 683.

[31] Again, the circumstances here are much different than in *Ruiz*. Although the questioning was conducted at the station house and the overall interaction was lengthy, the coercive pressures evident in *Ruiz* were not exhibited here as evidenced by the record and video of the questioning. The officers did not

engage in coercive, aggressive interrogation practices and did inform Crabtree of his rights.

[32] Our Supreme Court acknowledged in *Ruiz* that "a person is not in custody simply because he is questioned at a police station, or because he is an identified suspect, or because he is in a coercive environment." *Id.* Rather, custody "depends on the totality of the circumstances." *Id.* Under the totality of the circumstances here, we agree with the trial court that Crabtree was not in custody during the questioning at issue. Because Crabtree was not in custody, the officers were not required to inform Crabtree of his *Miranda* warnings, and Crabtree's statements to the officers were admissible at trial.

## B. Second Miranda Warning

[33] Crabtree concedes that he was given *Miranda* warnings *prior to* the polygraph examination. Crabtree argues, however, that he should have been re-read his *Miranda* rights after the polygraph examination, and prior to subsequent questioning. Crabtree admits that, although the polygraph waiver does not explicitly mention *Miranda*, the provisions of the waiver "are substantially identical to the *Miranda* warnings." Appellant's Br. p. 18. We have concluded, *supra*, that Crabtree was not in custody and, thus, was not entitled to *Miranda* warnings, much less a second *Miranda* warning. Even if Crabtree was entitled to be informed of the *Miranda* warnings, his argument that he was entitled to a second *Miranda* warning fails.

[34] In support of Crabtree's argument, he relies on *Partlow v. State*, 453 N.E.2d 259, 269 (Ind. 1983), *cert. denied*, in which our Supreme Court addressed a similar argument and held:

> [I]f at the commencement of custodial interrogation the suspect has been given an advisement and made a waiver in accordance with the guidelines in *Miranda*, that advisement "need not be repeated so long as the circumstances attending any interruption or adjournment of the process [are] such that the suspect has not been deprived of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation, including the right to cut off questioning. *Michigan v. Mosley*, [(1975) 423 U.S. 96, 96 S. Ct. 321, 46 L.Ed.2d 313]." *Owens v. State*, (1982) Ind., 431 N.E.2d 108, 110. Defendant showed that he had a continuing understanding of his rights and was willingly and knowingly proceeding with the interrogation by the police. There is no merit to the defendant's claim that his statement was inadmissible on this ground.

[35] Similarly, in *Shane v. State*, 615 N.E.2d 425, 427 (Ind. 1993), our Supreme Court observed: "after a *Miranda* advisement has been made[,] the advisement need not be repeated if the circumstances surrounding the interruption or adjournment of the process have not deprived the suspect of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation." The Court held that, "if the interruption is part of a continual effort by the police to gather information from the suspect, there can be little doubt as to the suspect's interests in the matter." *Shane*, 615 N.E.2d at 427. The *Shane* Court concluded that the defendant did not need to be re-advised of his rights because "[the defendant] voluntarily appeared at the police station,

received the *Miranda* advisement, executed a waiver of those rights without the force of threats, promises, or coercion, consented to providing officials with physical samples, and answered questions upon his return to the police station." *Shane*, 615 N.E.2d at 428.

[36] Here, Crabtree was read and waived his rights and voluntarily took part in the polygraph examination with Sergeant Roseberry. Crabtree then stayed in the same location where he was questioned by Sergeant Roseberry. Crabtree asked Sergeant Roseberry to reschedule; spoke with Sergeant Baxter "[m]inutes" later; asked Sergeant Baxter if he could reschedule; and subsequently spoke with Detective Earls. Tr. Vol. II p. 219.

[37] There was no significant interruption of the interview between the polygraph process and the questioning by the other officers. Further, during both the polygraph and the subsequent questioning, Crabtree was well-aware of the nature of the allegations against him, which did not change between the polygraph and the questioning. This was a continual effort by the officers to gather information from Crabtree, and Crabtree's interests did not change. There is no indication that Crabtree was deprived of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogations. Accordingly, even if Crabtree was entitled to *Miranda* warnings, a second *Miranda* warning after the polygraph process and before the other officers questioned Crabtree was not warranted in this case. *See Ogle v. State*, 698 N.E.2d 1146, 1148-49 (Ind. 1998) (finding a second *Miranda* warning was not required when the defendant was brought to the police station for

questioning; the defendant waived his *Miranda* rights; the police stopped the interrogation to investigate part of the defendant's story before resuming his interrogation "less than an hour later"; and the defendant was not readvised of his *Miranda* rights because the interruption was a "continual effort by the police to gather information").

## C. Right to Remain Silent

[38] Next, Crabtree argues that officers violated his right to remain silent under the Fifth Amendment. According to Crabtree, he twice invoked his right to remain silent by asking to reschedule the interview. Crabtree contends that, because the officers did not stop the interrogation when Crabtree asked to reschedule, his statements to the officers were inadmissible.

[39]
> It is well-settled that when an individual "'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Washington v. State*, 808 N.E.2d 617, 623 (Ind. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966)). "An assertion of *Miranda* rights must be clear and unequivocal, and in determining whether a person has asserted his or her rights, the defendant's statements are considered as a whole." *Clark v. State*, 808 N.E.2d 1183, 1190 (Ind. 2004). "Although there are no particular words of legal magic to cut off questioning, a suspect must do more than express reluctance to talk" in order to invoke his right to remain silent. *Powell v. State*, 898 N.E.2d 328, 337 (Ind. Ct. App. 2008). Review of whether an individual has invoked his right to remain silent is "intensely fact-sensitive." *Id.* (citing *Haviland v. State*, 677 N.E.2d 509, 514 (Ind. 1997)).

*State v. Battering*, 85 N.E.3d 605, 607 (Ind. Ct. App. 2017) ("*Battering*"). Law

enforcement must "scrupulously honor" a defendant's right to end questioning.

*Mendoza-Vargas v. State*, 974 N.E.2d 590, 595 (Ind. Ct. App. 2012).

[40] The United States Supreme Court explained the purpose of requiring an

accused to *unambiguously* assert his right to remain silent:

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. [*Davis v. United States*, 512 U.S. 452, 458-59, 114 S. Ct. 2350 (1994)]. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong." *Id.*, at 461, 114 S. Ct. 2350. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. *See id.*, at 459-461, 114 S. Ct. 2350; *Moran v. Burbine*, 475 U.S. 412, 427, 106 S. Ct. 1135, 89 L.Ed.2d 410 (1986). Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights "might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation." *Burbine*, 475 U.S., at 425, 106 S. Ct. 1135. But "as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.*, at 427, 106 S. Ct. 1135; *see Davis, supra*, at 460, 114 S. Ct. 2350.

*Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 2260 (2010).

When law enforcement fails to scrupulously honor a defendant's unambiguous

right to remain silent, any subsequent statement made by the defendant is inadmissible. *Mendoza-Vargas,* 974 N.E.2d at 597.

[41]     Prior to Crabtree's polygraph examination, Sergeant Roseberry advised Crabtree of his right to remain silent, which Crabtree indicated that he understood.[8]  When Sergeant Roseberry was interviewing Crabtree after Crabtree's polygraph examination, the following conversation occurred:

> A.  I, I don't want to cut you off or anything--
>
> Q.  No, you're fine.
>
> A.  --I, I'd be willing to talk to you more, but is there anyway, maybe, we could do it another day?
>
> Q.  Well, if, if you give me just a moment.  Let me go talk to the investigator.  I'm sure he will want to talk to you a little bit, if you wouldn't mind waitin'.  Okay?  I'll be right back.

Tr. Vol. III pp. 36-37.  Subsequently, when speaking with Sergeant Baxter, the following colloquy occurred:

> A. . . . I appreciate you right now, but is there— I have a, a whole lot to think about. . . . [I]s there a time we could schedule to talk later?

---

[8] At the suppression hearing, the video recording was also transcribed into the transcript of the hearing.  We, accordingly, will quote portions from the transcript at the suppression hearing for consistency.

Q. Yeah, you -- If you wanna talk later, what you need to do is probably talk to, to [Earls] about that. He is, he is the investigator that's in charge here. Okay? You can talk to him any time you want, as much as you want, but, you know, I'm gonna tell ya that it's been— you know, the pause in your voice and the, the hesitation, uh, tells me a lot. Like, "Man, I gotta go think." I mean, this is-

A. No, I'm innocent, just—

Q. It's like, "I gotta go think about this."

A. I'm not trying to think about this or tryin' to figure out a lie or anything like that. I'm just—

Tr. Vol. II p. 210. Later, Crabtree continued the conversation with Sergeant Baxter as follows:

A. I have one question to ask. If I tell you what I'm about to tell you?

Q. Okay.

A. Can I still go home to my mom's tonight?

Q. I think we could do that.

A. (Crying)

Q. Hey, we'll get through this okay? Will [sic] get through this, let's get through it.

*Id.* at 215. Crabtree went on to disclose his molestation of L.C.[9]

[42] Here, Crabtree argues that he unequivocally invoked his right to remain silent when he asked: "I, I'd be willing to talk to you more, but is there anyway, maybe, we could do it another day?" and "[ ] I appreciate you right now, but is there— I have a, a whole lot to think about. Is, is, is there a time we could schedule to talk later?" Tr. Vol. III pp. 36-37; Tr. Vol. II p. 210.

[43] Indiana courts have found the following phrases or statements indicated the defendants' unequivocal invocation of their Fifth Amendment right to remain silent: (1) "I'm done with answering questions right now[,]" *Battering*, 85 N.E.3d at 608; (2) "I'm done talking," *Risinger v. State*, 137 N.E. 3d 292, 299 (Ind. Ct. App. 2019), *trans. denied*; and (3) "I just want to get this over with . . . I want to go back home," and "They won't take me home." *State v. Glaze*, 146 N.E.3d 1086, 1092 (Ind. Ct. App. 2020).

[44] On the other hand, Indiana courts have found that certain statements, followed by the defendant continuing to speak with detectives, did not unequivocally invoke the defendant's Fifth Amendment right to remain silent: (1) "Yeah, I'm ready to cut this off cause, I mean I feel like ya'll [sic] getting ready [to] start asking me some crazy questions, you know what I'm saying and Man I'm done man," coupled with the defendant's continuing to speak "without pause" to

---

[9] Crabtree contended that he awoke to L.C. touching him and that, if he coerced L.C. to do so, it was while Crabtree was sleeping.

detectives even when told he did not have to do so, *Powell*, 898 N.E.2d at 337; (2) "[I'm] through with this", and "I said I'm through with it. I didn't kill nobody, you keep insisting I did and I didn't" and then continued to speak, *Haviland*, 677 N.E.2d at 514; and (3) "This is crazy. Y'all might as well send me across the street (referring to jail)[,]" "Please, man, you might as well take me across the street[,]" and "You already tryin' to charge me with this. So leave me alone and take me over here[,]" in combination with the defendant's decision to continue talking. *Clark*, 808 N.E.2d at 1190.

[45] We cannot find that Crabtree's statements unequivocally invoked his right to remain silent. Importantly, in both statements, Crabtree was clear that he wanted to answer the officers' questions but preferred to do so later. Crabtree did not assert that he was "done" answering questions or that he no longer wanted to answer questions. Instead, Crabtree asked if he could reschedule because he had a lot of things to think about—not that he wished to invoke his right to remain silent. In response to the first request to reschedule, Sergeant Roseberry said, "Well, if, if you give me just a moment. Let me go talk to the investigator. I'm sure he will want to talk to you a little bit, if you wouldn't mind waitin'. Okay? I'll be right back." Tr. Vol. III pp. 36-37. In response to the second request to reschedule, Sergeant Baxter said, "Yeah, you -- If you wanna talk later, what you need to do is probably talk to, to [Earls] about that. He is, he is the investigator that's in charge here." Tr. Vol. II p. 210. In both instances, Crabtree continued to answer questions. Asking to reschedule

questioning and then continuing to answer questions is different than asserting one's right to remain silent and declining to answer questions at all.

[46] We cannot say that Crabtree unambiguously asserted his right to remain silent. Accordingly, law enforcement did not violate Crabtree's Fifth Amendment right to remain silent. Crabtree has failed to demonstrate that the trial court erred by admitting his statements to the officers at his trial.

### D. Harmless Error

[47] Finally, even if the trial court abused its discretion by admitting Crabtree's statements, we find that any error was harmless. Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Mendoza-Vargas*, 974 N.E.2d at 597. To determine whether an error in the introduction of evidence affected the appellant's substantial rights, we assess the probable impact of that evidence upon the jury. *Id.* "A federal constitutional error is reviewed de novo and must be harmless beyond a reasonable doubt." *Davies v. State*, 730 N.E.2d 726, 735 (Ind. Ct. App. 2000) (internal citations and quotations omitted), *trans. denied*.

[48] Crabtree contends that, without the information Crabtree provided in his police interview, the only evidence to support his conviction is L.C.'s CAC interview. Crabtree argues that L.C.'s CAC interview is "far from overwhelming, and taken alone, raises substantial questions as to whether [Crabtree] would have been convicted on this evidence alone." Appellant's Br. p. 28. We disagree.

[49] Although L.C. was young, her interview was compelling. She described the details of the molestations, including using sensory descriptions to articulate the events as "hurting" her, Tr. Vol. II p. 155; it felt like Crabtree was "peeing on [her] hand," *Id.* at 157; and, when Crabtree made L.C. put her mouth on his penis, it tasted like "solid bread." *Id.* at 160. L.C. can also be seen in the video, as the transcript points out, "demonstrating with hand gesture[s]" when she described certain actions. *Id.* at 152.

[50] Our position does not waver merely because L.C. was hesitant to revisit and restate the facts at the protected persons hearing. As depicted in the video of the protected persons hearing, L.C. "enter[ed] the courtroom and c[ame] to a dead stop and stare[d] at the defendant when she s[aw] him." *Id.* at 61. L.C. then made statements while hiding under the witness stand. L.C. testified that she told her mother that Crabtree did things to her "[i]n the bed" while her mother was sleeping next to her. *Id.* at 80. L.C. also disclosed that Crabtree touched her with his hand. Although L.C. was significantly less forthcoming at the protected persons hearing, L.C.'s testimony at the protected persons hearing was consistent with her CAC interview.

[51] The fact that L.C.—a four-year-old child—described the molestation differently than an adult would have, does not render her testimony less compelling. Any error in admitting Crabtree's statements was harmless in light of L.C.'s CAC interview and testimony at the protected persons hearing.

## II. Inappropriate Sentence

Finally, Crabtree argues that his sentence is inappropriate.[10] Crabtree asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Wilson v. State*, 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)), trans. denied.

In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented. *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017), *trans. denied.* In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "whether another sentence is *more* appropriate; rather the question is whether the sentence imposed is inappropriate." *Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015) (citations and quotations omitted and emphasis supplied). "We begin this analysis with 'substantial deference to the trial court's sentence,' then 'independently examine' the defendant's offenses and

---

[10] In his summary of the argument, Crabtree argues that the trial court "abused its discretion" when it sentenced him to the maximum allowed sentence. Appellant's Br. p. 9. In his argument section, however, Crabtree asks us to revise his sentence pursuant to Indiana Appellate Rule 7(B), which allows us to modify a defendant's sentence in light of the nature of the offense and the defendant's character. Because the latter is the argument for which Crabtree more thoroughly articulates and cites authority, we will consider Crabtree's argument as one of an inappropriate sentence.

character." *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017) (quoting *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015)), *cert. denied*.

[54] We look to the statutory range established for the classification of the offense. The jury found Crabtree guilty of child molesting, a Level 1 felony. "A person who commits a Level 1 felony child molesting offense . . . shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." Ind. Code § 35-50-2-4(c). Crabtree received the maximum sentence of fifty years based on the trial court's finding that Crabtree was one of the worst of the worst offenders who did "the most heinous thing a dad could do." Appellant's App. Vol. II p. 16.

[55] First, when reviewing a sentence, we consider the nature of Crabtree's offense. Our analysis of the "nature of the offense" requires us to look at the extent and depravity of the offense and focus less on comparing the facts at hand to other cases. *Sorenson v. State*, 133 N.E.3d 717, 729 (Ind. Ct. App. 2019), *trans. denied.* Crabtree molested his four-year-old daughter "a lot of times." Tr. Vol. II p. 147. Crabtree was in a position of care and trust of his young daughter and Crabtree took advantage of that position. Crabtree molested L.C. in his bed while his wife was also sleeping in the bed; in another downstairs bedroom; and on a couch. L.C. described in age-appropriate, yet graphic terms, the acts of molestation, and she described that sometimes Crabtree "hurt" her when he molested her. *Id.* at 155. Crabtree showed L.C. what she described as a "naked video" on his phone. *Id.* at 156. L.C. articulated detailed descriptions of the molestations, including that it felt as if Crabtree "was peeing on [her] hand,"

and that Crabtree made L.C. put her mouth on his penis. *Id.* at 157, 160. L.C. described that Crabtree sometimes "pulls [her] pants off" when he rubs "[i]nside [her] butt-crack," and that sometimes, "he spreads out [her] legs so he can do it even more." *Id.* at 148. In summary, L.C. described many different acts of sexual conduct—both what L.C. was forced to perform and forced to submit to—and L.C. was clear that these incidents occurred multiple times. Crabtree could have faced multiple counts for the acts committed and has benefited from the State's decision to charge him with one count of child molestation.

[56]     Second, we examine Crabtree's character. An analysis of the offender's character involves a broad consideration of the defendant's qualities, life, and conduct. *Adams v. State*, 120 N.E.3d 1058, 1065 (Ind. Ct. App. 2019). Crabtree's prior criminal history, although not as recent, includes four prior felony burglary convictions. Additionally, five counts of unlawful possession of a firearm by a serious violent felon, Level 4 felonies, were pending at the time of Crabtree's sentencing on the child molesting charge. Crabtree's criminal history does not reflect well upon his character. *See Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) ("[A]lthough Rutherford's criminal history is not aggravating to a high degree, it still is a poor reflection on his character."). Crabtree's PSI also articulates a history of drug use, which the trial court noted as relevant to Crabtree's sentence. Crabtree admitted to using cocaine on a few occasions in 2018 and 2019, and Crabtree failed a Department of Child Services drug screen in January 2019 by testing positive for cocaine. Crabtree also admitted to past, regular marijuana use.

Given Crabtree's repeated molestation of his very young daughter, criminal history, and drug use, we decline to revise Crabtree's sentence pursuant to Indiana Appellate Rule 7(B) because Crabtree's sentence is not inappropriate.

## Conclusion

The trial court did not abuse its discretion in admitting into evidence Crabtree's voluntary statements to the officers, and Crabtree's sentence is not inappropriate. We affirm.

Affirmed.

Kirsch, J., and Pyle, J., concur.